TRANSDUCER PATENTS COMPANY, A LIMITED PARTNERSHIP, PETITIONER *v.* RENEGOTIATION BOARD, RESPONDENT

Docket Nos. 1052–R, 1059–R. Filed May 18, 1972.

*Robert M. Barton* and *Richard F. Oetting,* for the petitioner.
*Irwin Goldbloom,* for the respondent.

ATKINS, *Judge:* The respondent issued orders in which it was determined that petitioner had received excessive profits in the total amount of $1,075,000 during its fiscal years ended the last day of February 1957 through 1967.

The issues presented for decision are whether the petitioner was a subcontractor within the meaning of the Renegotiation Act of 1951, so that the profits resulting from royalties received by it during the above years from Statham Instruments, Inc., a corporation involved in various defense-related projects pursuant to renegotiable contracts, are subject to renegotiation, and, if so, whether such profits were excessive within the meaning of the Act.

# 330

Most of the facts have been stipulated and the stipulations together with the exhibits attached thereto are incorporated herein by this reference.

Transducer Patents Co., hereinafter referred to as the petitioner, is a limited partnership. Since its formation, Louis D. Statham has served as its only general partner and, pursuant to the terms of the partnership agreement, has been vested with the exclusive right to manage and control its affairs.

From about February 1943 until September 1943, Louis D. Statham was employed as a physicist by the Curtiss-Wright Corp., hereinafter referred to as Curtiss-Wright. During the course of such employment, he began the development of a new means of accurately measuring air pressure. Such means utilized a transducer device which was designed to convert physical energy into a measurable electric signal of high accuracy. The transducer embodied an unbonded strain gauge as its principal feature.

In September 1943, Statham left his employment with Curtiss-Wright and formed a partnership with his wife which was known as Statham Laboratories. Thereafter Statham Laboratories made transducers which were purchased by Curtiss-Wright. Such purchases were made pursuant to its agreement with the partnership and with Statham individually providing in part that all the inventions which were conceived of or made and which related to the items purchased, together with any patent applications and patents pertaining to such inventions, would be assigned to Curtiss-Wright.

Pursuant to the terms of such agreement, Statham assigned to Curtiss-Wright certain claimed inventions which related to the transducers he was developing. The claimed inventions which were assigned were embraced in six patent applications. Thereafter Curtiss-Wright entered into a further agreement with Statham Laboratories and with Statham individually wherein it granted to them a nonexclusive license to make and sell transducer devices using the claimed inventions in consideration of a royalty of 5 percent of sales.

The parties operated pursuant to the license agreement until about the middle of 1946. On June 6, 1946, Statham Laboratories, Inc., was organized under the laws of California. Such corporation, which was ultimately renamed Statham Instruments, Inc., and will hereinafter be referred to as Statham Instruments, took over the business of Statham Laboratories.[1] On or about June 15, 1946, Statham Instru-

---

[1] Until 1957 this corporation was closely held, with Statham and his wife owning over two-thirds of the stock. In 1957 a public offering of some of the stock was made and thereafter the corporation has been at all times relevant a publicly held company. Its shares are traded on the American Stock Exchange and certain other exchanges throughout the country.

ments entered into an agreement with Statham Laboratories which purported to authorize the former to manufacture and sell transducer devices. However, the rights of Statham Laboratories and of Statham individually as licensees under the Curtiss-Wright inventions were never actually assigned to Statham Instruments. After such time, Statham Instruments operated under its agreement with Statham Laboratories as if it were the licensee under the Curtiss-Wright license and neither Statham Laboratories nor Statham individually continued in business.

The inventions covered by the Curtiss-Wright license and embraced in the six applications which Statham had assigned became the subject of five patents which issued to Curtiss-Wright as follows:

| Patent No. | Date of issue |
|---|---|
| 2,453,601 | 11/ 9/48 |
| 2,455,883 | 12/ 7/48 |
| 2,530,184 | 11/14/50 |
| 2,573,285 | 10/30/51 |
| 2,573,286 | 10/30/51 |

Four of the above patents covered transducer designs which employed unbonded strain gauges and one covered an electronic circuit which was useful with the transducers.

At some time prior to April 1948, Statham Instruments was notified by Roy W. Carlson that in his opinion certain patents owned by him were being infringed by the corporation. At this time the corporation was well into the business of manufacturing and selling transducers of the type covered by the Curtiss-Wright patents. The Carlson patents were the dominant patents, covering a fundamental part of the more sophisticated technology embraced by the Curtiss-Wright patents. Because of this the corporation was of the opinion that it could not successfully manufacture transducer devices covered by the Curtiss-Wright patents without infringing the Carlson patents. It therefore sought and obtained from Carlson an exclusive license to make, use, and sell transducers covered by his patents in consideration of a royalty of 3 percent of sales.

After such time and until about the beginning of 1952 Statham Instruments made substantial sales of transducers covered by the Curtiss-Wright patents, many of which were also covered by the Carlson patents. During that period it was operating as an exclusive licensee under the Carlson patents and under the nonexclusive license of Statham Laboratories with respect to the Curtiss-Wright patents. The Carlson patents were due to expire in 1953 at which time the Curtiss-Wright patents would become dominant. Because of the uncertain relationship which existed between the corporation and Curtiss-

Wright and because of the possibility that Curtiss-Wright might license the use of its patents to potential competitors of the corporation once the shelter of the Carlson patents was removed, the corporation's patent attorney recommended that it obtain an exclusive license from Curtiss-Wright with respect to the Curtiss-Wright patents. The corporation's concerns in this regard were acute because at about the beginning of 1952 most of its transducers were sold, directly or indirectly, to the Government for use in flight-testing experimental military aircraft and because extensive Government procurement was then taking place to meet national defense needs attributable to the advent of the Korean war.

During the first part of 1952 Statham Instruments initiated and carried on negotiations with Curtiss-Wright in an attempt to obtain an exclusive license with respect to the Curtiss-Wright patents. Curtiss-Wright would not agree to an exclusive license of the patents for policy reasons of its own, but instead offered to sell the patents for $135,000 payable in installments over a period of 5 years. At that time, however, the management of Statham Instruments felt that it would be unwise for the corporation to purchase the patents because (1) the patents were considered as an intangible asset with no ascertainable value by the corporation's bankers—thus, their purchase would seriously impair its working-capital requirements by undermining its ability to obtain credit and would possibly violate conditions imposed with respect to its then-existing line of credit; (2) the useful lives of the Curtiss-Wright patents were believed to be only 3 to 4 years because of technical obsolescence; and (3) the corporation's future was uncertain because its then existing backlog consisted predominantly of military defense contracts which were subject to immediate cancellation.

Despite the above, Louis Statham felt impelled to find some means of reaching an agreement with Curtiss-Wright to obtain protection under the Curtiss-Wright patents which, upon the expiration of the Carlson patents, would become vital to the business of Statham Instruments. To achieve this end the petitioner was organized for the purpose of purchasing the patents from Curtiss-Wright. It was formed pursuant to a written partnership agreement dated March 14, 1952, among the stockholders of Statham Instruments. The partners, their respective interests in petitioner, and the initial contribution which each partner made it in March 1952 were as follows: [2]

---

[2] Charles Gass died on Oct. 16, 1961, and his estate is being probated in the State of California. His widow, Sarah E. Gass, is the executrix of his estate. She has since remarried and is now known as Sarah E. McNaughton.

Anna O. Statham died on Feb. 2, 1965, and her estate is being probated in the State of California. Louis D. Statham is the executor of her estate.

| Partner | Interest | Initial contribution |
|---|---|---|
| Louis D. Statham | 15/85 | $6,300 |
| Anna O. Statham | 15/85 | 6,300 |
| Anne Franson (Anne Statham) | 30/85 | 12,600 |
| C. A. Motz | 6/85 | 2,520 |
| Sarah E. Gass | 5/85 | 2,100 |
| Charles S. Gass | 5/85 | 2,100 |
| Gifford E. White | 6/85 | 2,520 |
| Ransom W. Chase | 3/85 | 1,260 |
| | | 35,700 |

The partners further agreed to contribute an additional $100,000 to petitioner over the succeeding 4 years.

The stockholders of Statham Instruments at that time and their respective shareholdings were as follows:

| Name | Shares owned | Name | Shares owned |
|---|---|---|---|
| Louis D. Statham | 9,720 | Gifford White | 1,800 |
| Anna O. Statham | 9,000 | C. S. Gass | 1,000 |
| C. A. Motz | 1,800 | Stanley Barnes | 90 |
| S. E. Gass | 2,000 | R. W. Chase | 90 |

On March 14, 1952, petitioner, Statham Instruments, and Curtiss-Wright entered into a three-party agreement (such agreement providing that it was entered into as of January 1, 1952) wherein Curtiss-Wright agreed to sell its entire interest in its patents to petitioner.[3] As part of such agreement, petitioner granted back to Curtiss-Wright a royalty-free, nonexclusive license under such patents as follows:

ASSIGNEE [petitioner] hereby grants to CURTISS an irrevocable non-exclusive royalty-free right and license under the * * * Patents to make or to have made for CURTISS in the United States, for use, sale and/or re-sale, throughout the world, the inventions covered by the * * * Patents or any of them, without any accounting whatsoever to anyone.

Pursuant to the above-described agreement Curtiss-Wright executed an assignment dated March 14, 1952, wherein it transferred to petitioner its entire right, title, and interest in and to the patents. The petitioner made payments to Curtiss-Wright as follows:

| | |
|---|---|
| Mar. 14, 1952 | $35,001 |
| Feb. 20, 1953 | 25,000 |
| Feb. 22, 1954 | 25,000 |
| Feb. 21, 1955 | 25,000 |
| Feb. 20, 1956 | 25,000 |
| Total | 135,001 |

[3] Shortly before such time Curtiss-Wright had entered into an agreement with Statham Laboratories and with Statham individually which terminated and canceled the latters' nonexclusive license under the Curtiss-Wright patents.

On November 4, 1952, petitioner as licensor and Statham Instruments as licensee entered into an agreement (such agreement providing that it was entered into as of January 1, 1952) with regard to the patents which provided in part as follows:

## II

(a) LICENSOR does hereby grant to LICENSEE a non-exclusive license to make or have made, for sale by LICENSEE or for use by LICENSEE, the inventions, hereinafter called "LICENSED INVENTIONS", covered by any or all of the claims of any or all of the following enumerated and listed patents * * * and to sell or to use the LICENSED INVENTIONS so made by or for LICENSEE. * * *

## III

LICENSEE shall have, without additional consideration, the following options, stated in Articles III(a), III(b) and III(c), * * *:

(a) LICENSOR agrees, on demand from LICENSEE, given to LICENSOR by notice in writing, on or after April 8, 1953, and before November 4, 1953, to grant, on all the terms and conditions of this agreement, reserving, however, to LICENSOR full legal title to said * * * [patents] and each of them, an exclusive license to make and have made for sale by LICENSEE all LICENSED INVENTIONS, other than the pressure measuring devices covered also by the Carlson United States Patent No. 2,059,549, and also an exclusive license to sell such LICENSED INVENTIONS, other than said pressure measuring devices; and in addition LICENSOR agrees that LICENSEE shall thereupon also have and retain a non-exclusive license to use all LICENSED INVENTIONS under the provisions of Article II(a) hereof, and, also, the non-exclusive license granted under the provisions of Article II(a) to make or have made for sale or use by LICENSEE the said pressure measuring devices * * *

(b) LICENSOR agrees, on demand from LICENSEE given to LICENSOR by notice in writing, on or after November 4, 1953, and prior to the exercise by LICENSEE of the option given in Article III(c) hereof, and prior also to midnight of March 15, 1956, to grant, on all of the terms and conditions of this agreement (reserving, however, to Licensor full legal title to said [patents] * * * and each of them), an exclusive license to make and have made for sale by LICENSEE all LICENSED INVENTIONS, and an exclusive license to sell, and a non-exclusive license to use the said LICENSED INVENTIONS so made by or for LICENSEE * * *

(c) LICENSEE shall have the option, exercisable by LICENSEE after January 15, 1954, and prior to midnight of March 15, 1956, by notice in writing given to LICENSOR, to purchase the entire right, title, and interest of LICENSOR in and to the [patents] and in and to the LICENSED INVENTIONS by payment, whichever is greater, of either (1) a lump sum equal to the sums then remaining on the date of the exercise of this option, to be paid to CURTISS * * * [or a lump-sum calculated by taking the running royalties payable to petitioner over any previous two-year period]. Upon exercise of said option, LICENSOR will execute promptly a written assignment of said patents in form suitable for recording in the United States Patent Office.

\* \* \* \* \* \* \*

(d) LICENSOR agrees that, excepting the license granted by LICENSOR to CURTISS * * * every license granted by LICENSOR hereafter to others than

LICENSEE under any one or all of the * * * [patents] shall be on the condition that:

(a) Insofar as said license grants any rights to make; or have made for sale, and sell LICENSED INVENTIONS other than pressure measuring devices covered by the Carlson Patent No. 2,059,549, such license shall terminate and be cancelled on the exercise by LICENSEE of the option given in Article III(a); and

(b) Insofar as said license grants any rights to make or have made for sale and to sell any LICENSED INVENTIONS, such license shall terminate and be cancelled on the exercise by LICENSEE of either the option given in Article III(b) or Article III(c).

Under the above-described agreement Statham Instruments agreed to pay petitioner a royalty of 5 percent of "licensed gross income" prior to its exercise of any of the above-described options and, with certain exceptions, a royalty of 8 percent after its exercise of either of the options provided in article III(a) or (b). Such provisions were intended to provide for payment to petitioner of the same percentage royalties which Statham Instruments had paid Carlson and Curtiss-Wright prior to the time petitioner purchased the patents, namely, 3 percent and 5 percent, respectively.

On May 27, 1953, petitioner and Statham Instruments entered into an agreement which reflected the exercise by Statham Instruments of the option described in article III(a) of the parties' agreement of November 4, 1952. This agreement provided in part as follows:

EXCLUSIVE LICENSE AGREEMENT

\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*　　　　\*

WHEREAS, heretofore the Licensor and Licensee entered into an agreement, hereinafter referred to as the License Agreement, effective as of the first day of January, 1952, wherein and whereby the Licensor granted to Licensee a non-exclusive right and license to make or have made for sale, or for use by Licensee, the inventions covered by any or all of the claims of any or all of the patents more specifically described in said License Agreement * * * and

WHEREAS, by the terms of said License Agreement, Licensor further agreed that at the Licensee's option to be exercised in writing between April 8, 1952 and November 4, 1953, to grant to Licensee an exclusive license to make and have made for sale by Licensee all of the inventions covered by the enumerated patents described in said License Agreement other than pressure measuring devices also covered by Carlson United States Patent No. 2,059,549; and

WHEREAS, by a letter dated April 8, 1953, Licensee exercised its option and demanded of Licensor an exclusive right and license in accordance with the terms of said License Agreement; and

WHEREAS, it has been and is now agreed by and between the parties hereto that the various inventions covered by any or all of the claims set forth in United States Patent No. 2,530,184 or United States Patent No. 2,573,285, and any and all instruments or devices made in accordance therewith or pursuant thereto, do not relate to pressure measuring devices also covered by Carlson United States Patent No. 2,059,549, and that accordingly in accordance with the terms of said

License Agreement, Licensee is entitled to an exclusive right and license under said Patents No. 2,530,184 and No. 2,573,285.

Now, IN CONSIDERATION OF THE PREMISES, IT IS HEREBY MUTUALLY UNDERSTOOD AND AGREED, as follows:

1. Licensor, subject to all of the terms and conditions of the aforementioned License Agreement, and subject to all of the terms and conditions of said Agreement with Curtiss-Wright Corporation, reference to which agreements is hereby made for further particulars, does hereby grant to said Licensee an exclusive license commencing as of April 8, 1953,

(a) To make or have made for sale by Licensee all inventions covered by any or all of the claims of either or both of the * * * [patents numbered 2,530,184 and 2,573,285], to sell or use such inventions so made by or for Licensee * * *

(b) To make or have made for sale or use by Licensee the inventions covered by any or all of the claims of any or all of the following * * * [patents numbered 2,453,601, 2,455,883 and 2,573,286], exclusive of pressure measuring devices which are also covered by Carlson United States Patent No. 2,059,549 * * *

2. Licensee hereby agrees, commencing as of the date of its said letter, i.e., April 8, 1953, to account for and pay Licensor in the manner provided for in said License Agreement, 8% of the licensed gross income as defined in said License Agreement arising from or pertaining to any device or invention as to which this exclusive License Agreement relates.

*      *      *      *      *      *      *

4. Licensee agrees that it will not assign or transfer its right hereunder without the written consent of Licensor being first had and obtained, as long as * * * [petitioner's agreement] with Curtiss-Wright Corporation remains executory. Licensor agrees that when said agreement with Curtiss-Wright Corporation has been fully performed by it, that it will execute such additional or further agreement as may be meet and proper in the premises to eliminate the terms and conditions contained in said agreement with Curtiss-Wright Corporation to which this license is subject, other than such rights as are permanently reserved to said Curtiss-Wright Corporation thereby.

5. Subject only to the effect of this agreement, and of said License Agreement and of said Agreement with Curtiss-Wright Corporation, Licensor reserves the full legal title in and to each and all of the Letters Patent hereinabove described.

On November 4, 1953, petitioner and Statham Instruments entered into a further agreement which reflected the exercise by Statham Instruments of the option described in article III(b) of the parties' agreement of November 4, 1952. This agreement provided in part as follows:

### EXCLUSIVE LICENSE AGREEMENT

*      *      *      *      *      *      *

WHEREAS, LICENSOR and LICENSEE heretofore entered into an agreement dated as of January 1, 1952, hereinafter referred to as the AGREEMENT, wherein and whereby LICENSOR granted to LICENSEE a certain Non-Exclusive License to make, sell or use certain inventions covered by the United States Letters Patent hereinafter more particularly referred to, and wherein and whereby LICENSOR further granted to LICENSEE certain rights and options, including an option to be exercised on or after April 8, 1953, for an Exclusive License to make, use and sell certain devices and inventions covered by certain of the here-

inafter mentioned patents and also including an option to be exercised on or after November 4, 1953, for an Exclusive License under all of the hereinafter mentioned patents; and

WHEREAS, on April 8, 1953, LICENSEE by notice in writing exercised the first of its aforementioned options and thereupon LICENSOR and LICENSEE entered into a written agreement wherein and whereby LICENSOR granted to LICENSEE the exclusive right and license to make, sell and use the inventions and devices covered by United States Patents No. 2530184 and No. 2573285; and

WHEREAS, on November 4, 1953, LICENSEE by notice in writing gave notice to LICENSOR of its election to exercise the second of its above mentioned options, and is entitled to an Exclusive License under all of the patents herein mentioned:

Now, THEREFORE, in consideration of the premises, IT IS MUTUALLY UNDERSTOOD AND AGREED AS FOLLOWS:

1. That said LICENSOR, TRANSDUCER PATENTS COMPANY, does hereby grant for the full life of each of the patents hereinafter described to said LICENSEE, STATHAM INSTRUMENTS, INC., a corporation, upon the terms and conditions hereinafter set forth:

(a) An exclusive right and license to make and have made for sale by LICENSEE:

(b) An exclusive right and license to sell; and

(c) An exclusive right and license to use; each and all of the devices and the inventions covered by any or all of the claims in any or all of the following * * * patents * * * [listing the 5 Curtiss-Wright patents]

  *   *   *   *   *   *   *

3. Said rights and license shall be subject to the provisions of that certain Agreement between LICENSOR and LICENSEE and Curtiss-Wright Corporation, a Delaware Corporation * * *

4. LICENSOR hereby reserves to itself, and LICENSEE hereby agrees to pay to LICENSOR for the foregoing rights and licenses, a royalty of 8% of all of its licensed gross income * * *

5. LICENSEE hereby agrees to make such payments, to keep proper books of account, and to otherwise perform and comply with all of the terms and provisions of said AGREEMENT not superceded hereby.

6. LICENSOR warrants that as of the date hereof it has no outstanding licenses or operating agreements relating to or affecting any of said listed patents, save and excepting those certain rights reserved to Curtiss-Wright Corporation contained in the aforementioned agreement with said corporation and save and excepting said AGREEMENT and said Exclusive License Agreement entered into as of April 8, 1953, with LICENSEE, and that it has full right and power to make and execute this Exclusive License Agreement subject to the terms herein set forth.

7. This Agreement shall supersede that certain License Agreement entered into as of April 8, 1953 by and between LICENSOR and LICENSEE, and said License Agreement shall be deemed cancelled and terminated and all rights and licenses relating to the patents referred to and described therein shall be governed by this instrument from and as of the date hereof.

8. It is understood and agreed that subject to the provisions referred to in Paragraph 3 hereof and the provisions of said AGREEMENT between the parties hereto dated as of January 1, 1952, LICENSEE shall have the right to grant licenses to others under said patents, in which event it shall pay to LICENSOR 8% of all of the licensed gross income as defined and set forth in the AGREE-

MENT, received by the sub-licensee from the manufacture, sale or use of said licensed instruments to or by purchasers other than Statham Laboratories, Inc.

\*      \*      \*      \*      \*      \*      \*

9. LICENSOR reserves unto itself and is hereby granted by LICENSEE a lien upon all the rights, privileges and licenses hereby granted to secure the prompt payment by LICENSEE of the royalties herein reserved and the prompt performance and compliance of the terms, conditions and agreements by LICENSEE to be performed or complied with; and in the event LICENSEE fails to pay any royalty herein reserved to LICENSOR and such default continues in whole or in part ten (10) days after written demand for payment made by LICENSOR upon LICENSEE; or in the event of any other default on the part of LICENSEE hereunder and such default continues in whole or in part thirty (30) days after written demand given by LICENSOR to LICENSEE to cure such default, LICENSOR, in addition to any other remedy it may have at law or in equity, may thereupon and without further notice terminate and cancel all further rights and licenses herein granted, by a notice in writing to LICENSEE of its elections so to do, and thereupon all rights and licenses hereby granted shall thereupon revert to and revest in LICENSOR.

At the time the above agreement was entered into the Carlson patents had expired and the Curtiss-Wright patents had become the dominant patents.

In 1955 Statham Instruments had an order in the amount of $200,000 from an instrumentality of the U.S. Government known as Arnold Engineering Co. At the time Statham Instruments had made delivery of instruments worth $150,000 and had instruments worth $45,000 ready for delivery, Arnold Engineering advised it that if the royalty paid to petitioner were not reduced from 8 percent to 5 percent the entire order would be canceled and competitors would be encouraged to manufacture the same products upon Arnold's indemnification against liabilities for infringing the Curtiss-Wright patents. Petitioner realized that if a secondary source of supply were developed by the Government the royalty payments that it would otherwise receive might be diminished. Under the circumstances petitioner felt that it had no choice but to reduce the rate at which royalties were being paid to it by Statham Instruments. Accordingly, its agreement with Statham Instruments was amended by instruments dated September 19, 1955, and January 1, 1956, to provide for a royalty rate of 5 percent.

The option provided by article III(c) of the November 4, 1952, agreement between Statham Instruments and petitioner, namely, the option to acquire the patents for a lump-sum figure, was to expire on March 15, 1956. On that date Statham Instruments and petitioner entered into an agreement which extended the life of the option for 1 year. This agreement, wherein petitioner was referred to as the First Party and Statham Instruments as the Second Party, provided in part as follows:

AGREEMENT TO EXTEND OPTION

\*           \*           \*           \*           \*           \*           \*

WHEREAS, by the terms of an agreement between the parties hereto \* \* \* Second Party has the option exercisable by it prior to midnight March 15, 1956, to purchase the entire right, title and interest of First Party in and to five certain patents described in said Agreement \* \* \* upon payment of the greater of two sums \* \* \* and

WHEREAS, by reason of exclusive licenses subsequently executed by said First Party to Second Party, Second Party has the exclusive right to make, or have made, and sell or use inventions covered by any or all of said \* \* \* [patents] and has been advised that by reason thereof it is the equitable owner of said patents, subject only to its payment of the exclusive license royalties to be paid under the terms of such exclusive license; and

\*           \*           \*           \*           \*           \*           \*

WHEREAS, Second Party desires to study the effect which the inclusion on its financial statement of the cost of said patents as an asset and the unpaid balance of the purchase price of said patents as a liability would have in connection with its credit and particularly upon its borrowing capacity; and to study the effect of other matters herein referred to, all of which cannot be accomplished prior to the expiration of said option; and

WHEREAS, the extension of said option is of substantial value to Second Party and Second Party has requested First Party to extend said option.

Now, IN CONSIDERATION OF THE PREMISES and of the payment by the Second Party of the sum hereinafter to be specified, it is hereby mutually understood and agreed as follows:

1. For and in consideration of the payment by Second Party to First Party of the sum of $10,000.00, lawful money of the United States, receipt whereof is hereby acknowledged by First Party, First Party does hereby extend the option granted to Second Party by Article III, subparagraph (c) thereof, contained in that certain agreement between the parties hereto entered into as of the first day of January 1952, for a period of one year, and Second Party shall have the right to exercise such option at any time prior to midnight, March 15, 1957, by notice in writing given to First Party, all as in said Article and in said subparagraph of said Agreement more particularly provided.

After the above agreement was entered into, Statham Instruments determined that it was in its best business interests to continue making percentage royalty payments to petitioner, rather than to convert such payments into the lump-sum payment provided for in the option. It did not have sufficient cash to exercise the option, and if it had borrowed sufficient money to exercise the option, the resulting liability would have had an adverse impact on its balance sheet and would have eliminated its available bank credit. Accordingly, the option was permitted to expire on March 15, 1957.

Since the execution of the "Exclusive License Agreement" of November 4, 1953, Statham Instruments has considered itself as the owner of the Curtiss-Wright patents. It has made known to its customers and competitors the probability that they would infringe the patents if they attempted to market a line of unbonded strain gauge transducers. On two occasions it has brought actions against companies, alleging

infringement of the patents, and on each occasion the action has been settled in its favor, prohibiting the other party from manufacturing the questioned device without a license from it. On each occasion it thereafter has granted the company involved a sublicense under the patents.

Since January 1, 1956, Statham Instruments has paid royalties at the rate of 5 percent to petitioner on sales of devices encompassing claims under the Curtiss-Wright patents. During the years before us petitioner received royalties from Statham Instruments which were attributable to Statham Instruments' renegotiable business and non-renegotiable business as follows:

| Year ended | Renegotiable | Nonrenegotiable | Total |
|---|---|---|---|
| 2/28/57 | $151,349 | $45,976 | $197,325 |
| 2/28/58 | 183,208 | 47,242 | 230,450 |
| 2/28/59 | 193,323 | 42,150 | 235,473 |
| 2/29/60 | 293,818 | 47,038 | 340,856 |
| 2/28/61 | 179,700 | 30,230 | 209,930 |
| 2/28/62 | 266,891 | 57,006 | 323,897 |
| 2/28/63 | 216,266 | 52,722 | 268,988 |
| 2/29/64 | 249,794 | 58,594 | 308,388 |
| 2/28/65 | 195,090 | 64,683 | 259,773 |
| 2/28/66 | 271,680 | 97,450 | 369,130 |
| 2/28/67 | 222,650 | 95,930 | 318,580 |

The respondent determined that the petitioner had received excessive profits as follows:

| Year ended | Excessive profits | Year ended | Excessive profits |
|---|---|---|---|
| 1957 | $60,000 | 1963 | $95,000 |
| 1958 | 75,000 | 1964 | 115,000 |
| 1959 | 80,000 | 1965 | 80,000 |
| 1960 | 145,000 | 1966 | 130,000 |
| 1961 | 75,000 | 1967 | 95,000 |
| 1962 | 125,000 | | |

## OPINION

The Renegotiation Act of 1951 is generally applicable to all contracts with certain specified departments of the Government and related subcontracts.[4] The term subcontract is defined in the Act as

[4] Sec. 102 of the Act provides in part as follows:

(a) IN GENERAL.—The provisions of this title shall be applicable (1) to all contracts with the Departments specifically named in section 103(a), and related subcontracts, to the extent of the amounts received or accrued by a contractor or subcontractor on or after the first day of January 1951, whether such contracts or subcontracts were made on, before, or after such first day * * *

Sec. 103 provides in part as follows:

SEC. 103. DEFINITIONS.

For the purposes of this title—

(a) DEPARTMENT.—The term "Department" means the Department of Defense, the Department of the Army, the Department of the Navy, the Department of the Air Force, the Maritime Administration, the Federal Maritime Board, the General Services Administration, the National Aeronautics and Space Administration, the Federal Aviation Agency, and the Atomic Energy Commission. * * *

including any contract or arrangement covering the right to use any patented method, formula, or device for the performance of a contract or a subcontract.[5]

The initial contention made by petitioner is to the effect that the term subcontract as used in section 103 (g) (2) of the Act was designed to encompass only license agreements involving patents; that the sale of a patent is not includable within such term; that its agreements with Statham Instruments, although cast in the terminology of an exclusive license, effectuated a sale of the patents here involved pursuant to the principles established in *Waterman* v. *Mackenzie*, 138 U.S. 252; that it was not, therefore, a subcontractor within the meaning of the Act during the years before us; and that, accordingly, the profits earned by it during such years are not properly subject to renegotiation.

The respondent agrees that the sale of a patent does not constitute a subcontract within the meaning of section 103 (g) (2) of the Act. Indeed, in section 1499.1–5 of the Renegotiation Board Regulations it is specifically provided that sales of patents do not constitute subcontracts within such section even though payment is to be made in installments or on the basis of a percentage of sales or profits attributable to the patented articles.[6] However, respondent contends that under *Water-*

[5] Sec. 103 of the Act provides in part as follows:

(g) SUBCONTRACT.—The term "subcontract" means—

\* \* \* \* \* \* \*

(2) any contract or arrangement covering the right to use any patented or secret method, formula, or device for the performance of a contract or subcontract. \* \* \*

[6] These regulations provide in part as follows:

(a) Agreements between private persons for the sale or licensing of a patent are subject to the following rules:

(1) (i) Section 103(g)(2) of the act defines the term "subcontract" as including "any contract or arrangement covering the right to use any patented or secret method, formula, or device for the performance of a contract or subcontract; \* \* \*." There is absent any reference to a transaction in which the owner by a present transfer divests himself of his title to the patented method, formula, or device. All that is dealt with is an arrangement under which the owner of the patent grants the contractor or subcontractor permission to use the method, formula, or device, retaining in himself the title thereto. \* \* \*

(ii) Section 103(g)(1) includes in the definition of a subcontract "any purchase order or agreement \* \* \* to \* \* \* furnish any materials, required for the performance of any other contract or subcontract, \* \* \*." While the term "materials," as defined in section 103(k) of the act, may be broad enough to include patents, the Board is of the opinion that, by dealing specially with patents in section 103(g)(2), Congress thereby limited the renegotiable scope of transactions involving patents to licenses for the use thereof. Plainly, Congress did not intend that sales of patents, providing for the present unconditional transfer of title from the owner to the purchaser, should be subject to renegotiation.

(2) A present unconditional transfer by the holder of a patent of all his right, title and interest therein for its remaining life is one in which the transferee immediately acquires full rights of ownership, including the right to license others to use such patent, or to sell it and convey all his right, title and interest therein. The failure of a transfer to include either of these rights disqualifies the transaction as a present unconditional transfer. Accordingly, a transaction involving the retention of a security title to insure the vendor against loss upon a default, or of a right of recapture upon default, would fall short of a present unconditional transfer of title to the patent, and would amount to no more than a "contract or arrangement covering the right to use" as described in section 103(g)(2) of the act. The fact that the payment is to be made by

*man* v. *Mackenzie, supra,* the transfer of something less than the exclusive rights to make, use, and sell for the life of a patent does not constitute an assignment of the patent, and that in determining whether a sale occurred it is necessary to examine not only the documents but all the surrounding facts to determine whether the holder of the patent intended to, and did, surrender all his interest in the patents. It is his position that petitioner having granted to Curtiss-Wright an irrevocable, royalty-free, nonexclusive license under the patents here involved, could not thereafter convey to Statham Instruments the "exclusive" rights to make, use, and sell under the patents within the principles established in *Waterman* v. *Mackenzie, supra.* He further contends, that petitioner expressly reserved the "full legal title" in and to the patents under its agreements with Statham Instruments, and that, therefore, it did not intend to sell, nor did it accomplish the sale of, its entire interest in such patents.

Before considering the contentions raised above, we must first consider the contention of petitioner that the holdings of this Court in the prior case of *Ransom W. Chase,* T.C. Memo. 1965–202, established the fact that petitioner's interests in the patents here involved were sold to Statham Instruments and that, therefore, the doctrine of collateral estoppel precludes the Government from relitigating such issue. The doctrine of collateral estoppel was fully articulated in the case of *Commissioner* v. *Sunnen,* 333 U.S. 591. There the Supreme Court stated in part as follows:

The general rule of *res judicata* applies to repetitious suits involving the same cause of action. It rests upon considerations of economy of judicial time and public policy favoring the establishment of certainty in legal relations. The rule provides that when a court of competent jurisdiction has entered a final judgment on the merits of a cause of action, the parties to the suit and their privies are

---

the transferee on the installment basis, or on the basis of a percentage of sales or profits from the sale of articles or services covered by the patent, does not affect the question. * * *

(3) A licensing arrangement which qualifies under the capital gain and loss provisions of section 1235 of the Internal Revenue Code of 1954 may nonetheless be subject to renegotiation. Section 1235 covers the treatment to be accorded for tax purposes to the transfer of "all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights." Section 1.1235–2(b)(2) of the regulations under the 1954 Code (26 CFR 1.1235–2(b)(2)) includes within the meaning of rights which are not substantial, retention by the transferor of (i) legal title for the purpose of securing performance or payment by the transferee; and (ii) rights in the property which are not inconsistent with the passage of ownership, such as retention of a security interest (vendor's lien), or a reservation in the nature of a condition subsequent (provision for forfeiture on account of nonperformance).

(b) For renegotiation purposes, different rules prevail. The renegotiability of transactions involving patents is determined exclusively by the provisions of section 103(g)(2) of the act. As indicated in paragraph (a)(2) of this section, retention of legal title or of a right of recapture causes the transaction to fall short of a present unconditional transfer of title, and such a transaction is subject to renegotiation. On the other hand, retention of a vendor's lien is not inconsistent with an absolute sale and will not of itself subject the transaction to renegotiation.

thereafter bound "not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Cromwell* v. *County of Sac*, 94 U.S. 351, 352, 24 L. Ed. 195. The judgment puts an end to the cause of action, which cannot again be brought into litigation between the parties upon any ground whatever, absent fraud or some other factor invalidating the judgment. [Citations omitted.]

But where the second action between the same parties is upon a different cause or demand, the principle of *res judicata* is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." *Cromwell* v. *County of Sac, supra*, 353. * * *

In the *Chase* case the Commissioner determined that petitioner's partners were required to report the amounts they had received from Statham Instruments as ordinary income rather than capital gains, and that Statham Instruments was not entitled to deduct such amounts as ordinary and necessary business expenses. There the Government contended, in effect, that for tax purposes Statham Instruments should be viewed as having initially purchased the patents from Curtiss-Wright with the result that the amounts paid petitioner's partners constituted amounts paid them on account of their stockholdings in Statham Instruments and hence dividend income to them. The Government further contended, in effect, that if it were determined that the partnership had initially purchased the patents from Curtiss-Wright, the royalties paid by Statham Instruments to petitioner's partners constituted dividend income to them to the extent such royalties were unreasonable in amount and not deductible by Statham Instruments as ordinary and necessary business expenses. As indicated in the reply brief filed by the Government in *Chase*, as well as by us in our opinion, once it was determined that the partnership purchased the patents initially and that the royalties paid by Statham Instruments were reasonable in amount, there was no contested issue as to whether the agreements between petitioner and Statham Instruments accomplished the sale of the patents pursuant to the doctrine of *Waterman* v. *Mackenzie, supra*, or merely a licensing arrangement. In *Chase* we stated "Respondent does not question the reporting by the individual petitioners of their distributive shares as long-term capital gains if this Court finds that the partnership did purchase the patents and that the royalty payments are reasonable in amount." Inasmuch as we held in *Chase* that the partnership had purchased the patents and that the royalty payments were reasonable in amount, it seems clear that the issue with which we are presently concerned, namely, whether petitioner sold its ownership interest in the patents to Statham Instruments, was not litigated in the *Chase* case, nor did our decision therein

constitute a determination with respect thereto. Accordingly, the doctrine of collateral estoppel does not serve to foreclose our present inquiry into such matter.

We turn then to a consideration of the contention of the parties as outlined hereinabove. We cannot agree with the respondent's position that because of having previously granted Curtiss-Wright an irrevocable nonexclusive license under the patents, the petitioner could not thereafter convey its ownership in the patents to Statham Instruments by granting to the latter the exclusive right to make, use, and sell under the patents. It appears settled that the sale of a patent may be accomplished by means of an exclusive license despite the fact that nonexclusive licenses under the patent have been previously granted and are outstanding as of the time of the sale. *Bell Intercontinental Corporation* v. *United States*, (Ct. Cl.) 381 F. 2d 1004, and cases cited therein. Cf. *Hook* v. *Hook & Ackerman*, (C.A. 3) 187 F. 2d 52; *Donald C. MacDonald*, 55 T.C. 840. In the *Bell* case the court analogized such a transaction to one in which "a grantor conveys a fee simple interest in land, subject to an irrevocable easement in perpetuity the grantor had previously conveyed to a third party." The court continued as follows:

The fact that the grantor in such circumstances reserved the right to obtain future payments from the easement holder does not mean that the grantor retained a continuing property interest in the realty—indeed, in the present illustration he divested himself entirely of that; it means rather that the grantor retained a contractual right vis-a-vis the easement holder to receive payments for an interest already conveyed. Similarly, Bell's right * * * to receive future payments for the limited license it previously conveyed was based not on a continuing proprietary right in the invention, but on a contractual right to receive payments for a prior transfer.

There can be no question that the petitioner acquired full ownership of the patents from Curtiss-Wright and that, thereafter, it could transfer away all such interest. At the time it acquired ownership of the patents it granted back to Curtiss-Wright an irrevocable nonexclusive license which was free of royalties. While we would reserve our opinion as to the approach taken in the *Bell* case in situations where a patent owner continues to derive royalties from a previously granted nonexclusive license subsequent to the grant of an exclusive license, we see no reason why the transfer by petitioner to Statham Instruments of "exclusive rights to make, use and sell" under the patents could not be considered a transfer of ownership in the patents, subject, of course, to the nonexclusive license previously granted to Curtiss-Wright. Certainly the royalty-free nature of such previously granted nonexclusive license would indicate that petitioner retained no ownership interest in the patents by reason thereof.

Nor can we agree with the respondent's contention that petitioner retained "full legal title" in and to the patents subsequent to November 4, 1953, the time when it entered into its second "Exclusive License Agreement" with Statham Instruments by reason of the latter's election to exercise the option provided it in article III(b) of the parties' agreement of November 4, 1952. While it is true, as asserted by respondent, that the parties' agreement of November 4, 1952, which provided for such option also provided that petitioner would retain "full legal title" to the patents, it seems clear that in the absence of a provision to the contrary, the provisions of the subsequent agreement which the parties entered into on November 4, 1953, should be viewed as the operative ones with respect to their interests in the patents.

Such agreement provided Statham Instruments with exclusive rights to make, use, and sell under the patents, subject only to the previously granted nonexclusive rights in favor of Curtiss-Wright. Such agreement also provided that Statham Instruments would be free to sublicense others under the patents without the consent or approval of petitioner.

Pausing at this point, it seems clear that the effect of the above provisions, taken alone, would be to convey petitioner's ownership interest in the patents to Statham Instruments pursuant to the doctrine articulated in *Waterman* v. *Mackenzie, supra.* There the Supreme Court stated in part:

Every patent issued under the laws of the United States for an invention or discovery contains "a grant to the patentee, his heirs and assigns, for the term of seventeen years, of the exclusive right to make, use and vend the invention or discovery throughout the United States and the Territories thereof." Rev. Stat. § 4884. The monopoly thus granted is one entire thing, and cannot be divided into parts, except as authorized by those laws. The patentee or his assigns may, by instrument in writing, assign, grant and convey, either, 1st, the whole patent, comprising the exclusive right to make, use and vend the invention thoughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. Rev. Stat. § 4898. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers; in the second case, jointly with the assignor; in the first and third cases, in the name of the assignee alone. Any assignment or transfer, short of one of these, is a mere license, giving the licensee no title in the patent, and no right to sue at law in his own name for an infringement. Rev. Stat. § 4919; *Gayler* v. *Wilder,* 10 How. 477, 494, 495; *Moore* v. *Marsh,* 7 Wall. 515. In equity, as at law, when the transfer amounts to a license only, the title remains in the owner of the patent * * *

Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions. * * *

As the above language indicates, the fact that the agreement was entitled an "Exclusive License Agreement" would not preclude the

conclusion that petitioner's ownership interest in the patent was conveyed to Statham Instruments. Nor would the fact that the agreement provided for termination upon default have such an effect. *Littlefield* v. *Perry*, 21 Wall. 205. In *Littlefield* the Supreme Court stated in part:

Neither the agreement to account and pay the royalty nor the clause of forfeiture for non-performance contained in that instrument reduced them to the position of licensees. The agreement to account and pay formed part of the consideration of the assignment, and was in effect an agreement to pay at a future time a sum to be determined by the number of articles made and sold. For the non-payment or other non-performance a forfeiture might be enforced as for condition broken, but until it was enforced the title granted remained in the assignees.

Turning back to the agreements before us, we see nothing inconsistent with the conclusion that petitioner transferred its ownership in the patents here involved under the parties' second "Exclusive License Agreement." Such agreement was not expressly made subject to the terms and conditions of the agreement of November 4, 1952, as was the parties' first "Exclusive License Agreement" of May 27, 1953; nor did the parties provide in such agreement that petitioner reserved full legal title in and to the patents as they so provided in their first "Exclusive License Agreement." Moreover, the agreement specifically provides that its provisions supersede those of the first "Exclusive License Agreement." Further, the agreement provides for the reservation of a lien by petitioner to secure the payment of royalties—a provision which to us would seem somewhat superfluous if petitioner had intended to, and did, retain title to the patents as provided in the parties' agreement of November 4, 1952.

Finally, the actions of the parties subsequent to the time of their second "Exclusive License Agreement" have been consistent with the view that petitioner intended to, and did, accomplish the transfer of its ownership in the patents to Statham Instruments under such agreement. In their subsequent agreement to extend Statham Instruments' option to convert the royalty payments into a single lump-sum payment, the parties acknowledged that Statham Instruments was the equitable owner of the patents. Further, since the time of the second "Exclusive License Agreement," Statham Instruments has in all significant respects acted as if it were the owner of the patents; making known to its customers and competitors that it owned the patents, challenging alleged infringements of them, and licensing others to use them.

In view of the foregoing, it is our conclusion that petitioner accomplished the sale of its ownership interest in the patents to Statham Instruments as of November 4, 1953. Accordingly, it was not a sub-

contractor within the meaning of section 103 (g) (2) of the Act during the years before us, and, therefore, the amounts received by it from Statham Instruments during such years are not subject to renegotiation.

It should be added that we find nothing inconsistent with the above conclusion and the requirement of the regulations (which are set forth in footnote 6 *supra*) that the sale of a patent must accomplish the present transfer of title to the patent. As indicated in the language of *Waterman* v. *Mackenzie, supra*, which is set out hereinabove, the granting of an exclusive license such as the one present herein effectuates an assignment of the patents so licensed and transfers title to such patents to the licensee. See *Hook* v. *Hook & Ackerman, supra*, and cases cited therein.

The only provision of the regulations with which our present holding might conflict is that provision which indicates that a present sale of a patent is not accomplished where the original patent owner retains a right to recapture the patents upon his assignee's default. This provision seems obviously inconsistent with the Supreme Court's holding in *Littlefield* v. *Perry, supra*, a venerable but still vigorous principle of patent law. However, the respondent herein, though fully aware that the regulation provisions would be given the fullest consideration in this case, has not mentioned this provision in the briefs which he filed subsequent to the trial herein. Under these circumstances, and in view of the important role the Supreme Court has played in the development of our patent law,[7] we would decline to follow that provision of the regulations insofar as it takes a position contrary to that expressed in *Littlefield* v. *Perry, supra*, unless a clear congressional intent justifying such provision be shown. Suffice it to say that we have thoroughly examined the legislative committee hearings and reports accompanying not only the Renegotiation Act of 1951 and its predecessor Acts, but also those accompanying the Royalty Adjustment Act of 1942,[8] and have found nothing to indicate that Congress intended to differentiate between sales of patents effectuated by out-and-out assignments and sales effectuated by exclusive license arrangements coming within the principles articulated in *Waterman* v. *Mackenzie, supra*, or that Congress was in any way concerned with the type of arrangements the assignor of a patent

---

[7] See, e.g., *Gayler* v. *Wilder*, 51 U.S. 501 ; *Littlefield* v. *Perry*, 21 Wall. 205 ; *Rude* v. *Westcott*, 130 U.S. 152 ; *Waterman* v. *Mackenzie*, 138 U.S. 252 ; *E. W. Bliss Co.* v. *United States*, 253 U.S. 187 ; *Crown Co.* v. *Nye Tool Works*, 261 U.S. 24 ; *Ind. Wireless Co.* v. *Radio Corp.*, 269 U.S. 459 ; and *United States* v. *Gen. Elec. Co.*, 272 U.S. 476.

[8] Such Act, which expired some 6 months subsequent to the close of World War II, might be considered the legislative forebear of the present provisions dealing with patents in the Renegotiation Act of 1951 inasmuch as Renegotiation Acts prior to the 1951 Act contained no specified provisions relating to patents.

might devise to secure his assignee's performance. In view of the above, there is no justification for reaching a decision adverse to petitioner on account of this provision of the regulations.

We hold that the profits earned by petitioner during the years before us were not properly subject to renegotiation. We, therefore, do not reach the further contentions raised by the parties.

*Decisions will be entered for the petitioner.*