GEORGE M. WOLFF AND TRUMAN E. PHILLIPS, CO-PARTNERS DOING BUSINESS UNDER THE FIRM NAME OF WOLFF AND PHILLIPS, PETITIONERS, *v.* EDWARD MACAULEY, ACTING CHAIRMAN, UNITED STATES MARITIME COMMISSION, RESPONDENT.

Docket No. 498–R. Promulgated January 27, 1947.

*Donald O. Lincoln, Esq.*, for the petitioners.
*Harland F. Leathers, Esq.*, for the respondent.

OPINION.

ARUNDELL, *Judge*: The respondent has moved that this proceeding be dismissed for lack of jurisdiction under section 403 (e) (2) of the Renegotiation Act, as amended.

On March 12, 1946, respondent determined that the amount of excessive profits of the petitioners for the calendar year 1942 under their renegotiable contracts was $60,000, and notice of his determination was sent to the petitioners on that date. On June 7, 1946, petitioners filed their petition for a redetermination by this Court, and on September 19, 1946, an amended petition, hereinafter referred to as the petition.

The petition alleges that the petitioners are copartners, doing business under the firm name of Wolff and Phillips, with their principal office at Portland, Oregon; that they are both duly licensed and registered architects and members of the American Institute of Architecture; and that their partnership was formed in January 1942 and is still in existence. It is further alleged that the subject matter of the renegotiation was four subcontracts: First, a contract entered into on January 13, 1941, with the Oregon Shipbuilding Corporation, referred to as subcontract 16; second, a contract entered into on February 9, 1942, with Kaiser Co., identified as subcontract 8; third, a contract dated June 2, 1942 with Kaiser Co. referred to as subcontract 17; and, fourth, purchase order No. 71742, dated October 16, 1942, issued by the Air Reduction Sales Co.

It is alleged that under subcontract 16 with the Oregon Shipbuilding Corporation the petitioners were to furnish architectural personnel services, and facilities for the design and inspection of certain enumerated buildings at the shipyard located in Portland, Oregon. Petitioners were to prepare preliminary studies, working drawings, specifications, and the drafting of forms of proposals and contracts, and

were to supervise and inspect the construction. The fee for these services was to be paid at the rate of 5 per cent computed on the total amount of contracts approved for the construction of the respective buildings. Fees received under this contract in 1942 amounted to $19,775.45.

Under the provisions of subcontract 8, the petitioners were to furnish the Kaiser Co. all the drawings necessary for a complete design of some 14 buildings at the shipyard of the company in Vancouver, Washington, and were to prepare all necessary lists of materials to be used in the construction of the buildings. A fixed fee of $44,628 was set. It is stated that under this contract the petitioners "further agreed to issue invitations and proper drawings of the buildings being bid on to prospective bidders, together with copies of the standard form of subcontract and the Union contract of the Kaiser Company, Inc." Fees under this contract and under subsequent change orders in 1942 amounted to $85,044.34.

Subcontract 17 contained substantially the same provisions as subcontract 8 in connection with the design of buildings at the Kaiser Co. shipyard on Swan Island, Portland, Oregon. It was contemplated that the designs for the Vancouver shipyard buildings would be used for the Swan Island buildings, and a fixed fee of $25,000 was set for the petitioners' services. Fees received under this contract in 1942 amounted to $23,750.

Purchase order No. 71742 related to the furnishing by petitioners of architectural services for the construction of an oxygen storage building at the Vancouver shipyard. It is stated with reference to this purchase order that "the fee was based on 5% of estimated costs." Fees received under this contract in 1942 amounted to $4,250.

Respondent takes the position that petitioners are subcontractors described in section 403 (a) (5) (B) of the Renegotiation Act, as amended by section 701 of the Revenue Act of 1943, and that by reason thereof they are excluded under section 403 (e) (2) from filing a petition with this Court for redetermination.

The pertinent provisions of the Renegotiation Act are set out in the margin.[1]

---

[1] SEC. 403. (a) For the purposes of this section—

(1) The term "Department" means the War Department, the Navy Department, the Treasury Department, the Maritime Commission, the War Shipping Administration, Defense Plant Corporation, Metals Reserve Company, Defense Supplies Corporation, and Rubber Reserve Company, respectively.

\*　　　\*　　　\*　　　\*　　　\*　　　\*

(5) The term "subcontract" means—

(A) Any purchase order or agreement to perform all or any part of the work, or to make or furnish any article, required for the performance of any other contract or subcontract, but such term does not include any purchase order or agreement to furnish office supplies; or

(B) Any contract or arrangement other than a contract or arrangement between two contracting parties, one of which parties is found by the Board to be a bona fide execu-

In support of his motion to dismiss, respondent contends that subcontracts 8 and 17 are within subpart (ii) of section 403 (a) (5) (B), reading "under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring a contract or contracts with a Department or a subcontract or subcontracts," inasmuch as the petition alleges that under these subcontracts petitioners "agreed to issue invitations and proper drawings of the buildings being bid on to prospective bidders, together with copies of the standard form of subcontract and the Union contract of the Kaiser Company, Inc." He further contends that subcontract 16 and purchase order No. 71742 are within subpart (i) of section 403 (a) (5) (B), reading, "any amount payable under which is contingent upon the procurement of a contract or contracts with a Department or of a subcontract or subcontracts, or determined with reference to the amount of such a contract or subcontracts or such contracts or subcontracts," inasmuch as under the former, according to the petition, the fee for the petitioner's services "was to be paid at the rate of 5%, computed on the total amount of contracts approved for the construction of the respective buildings" and under the latter "the fee was based on 5% of estimated costs."

Petitioners, in a memorandum filed in opposition to respondent's motion to dismiss, contend that they are not subcontractors described in section 403 (a) (5) (B), and that the legislative history demonstrates that the statute was aimed solely at manufacturers' agents or representatives and sales engineers, whose fees and commissions were not renegotiable prior to the adoption of the statute.

---

tive officer, partner, or full-time employee of the other contracting party, (i) any amount payable under which is contingent upon the procurement of a contract or contracts with a Department or of a subcontract or subcontracts, or determined with reference to the amount of such a contract or subcontract or such contracts or subcontracts, or (ii) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring a contract or contracts with a Department or a subcontract or subcontracts * * *.

*     *     *     *     *     *     *

(e)

*     *     *     *     *     *     *

(2) Any contractor or subcontractor (excluding a subcontractor described in subsection (a) (5) (B)) aggrieved by a determination of the Secretary made prior to the date of the enactment of the Revenue Act of 1943, with respect to a fiscal year ending before July 1, 1943, as to the existence of excessive profits, which is not embodied in an agreement with the contractor or subcontractor, may, within ninety days (not counting Sunday or a legal holiday in the District of Columbia as the last day) after the date of the enactment of the Revenue Act of 1943, file a petition with The Tax Court of the United States for a redetermination thereof, and any such contractor or subcontractor aggrieved by a determination of the Secretary made on or after the date of the enactment of the Revenue Act of 1943, with respect to any such fiscal year, as to the existence of excessive profits, which is not embodied in an agreement with the contractor or subcontractor, may, within ninety days (not counting Sunday or a legal holiday in the District of Columbia as the last day) after the date of such determination, file a petition with The Tax Court of the United States for a redetermination hereof.

*     *     *     *     *     *     *

The provisions of section 403 (a) (5) (B) were first added to the Renegotiation Act by Public Law No. 149, 78th Cong., 1st sess., approved July 14, 1943, and effective as of April 28, 1942. The Act itself is entitled, "An Act to Prevent the Payment of Excessive Fees or Compensation in Connection With the Negotiation of War Contracts." Prior to the enactment, the House of Representatives' Committee on Naval Affairs held hearings on the bill and submitted a report [2] explaining the need for the legislation, in part, as follows:

\* \* \* The purpose of the legislation is to clarify the present definition contained in section 403 (a) (5), by expressly including certain types of contracts or arrangements as "subcontracts" for the purpose of renegotiation.

### Need for Legislation

In hearings just concluded before the House Naval Affairs Committee, which were in effect a continuation of hearings held early last summer on the same subject, considerable evidence was presented to the committee which demonstrated the unconscionable profits being realized by numerous manufacturers' agents or "war brokers" in connection with the procurement of Government contracts.

\* \* \* \* \* \* \*

It was shown that the amounts being paid to these agents in selling commissions and fees in respect to subcontracts were at least as great as the amounts being paid in connection with prime contracts. All of this expense, of course, must ultimately be borne by the taxpayers.

*Each agent was questioned regarding the nature of his services. It was developed that these services consisted primarily of ordinary salesmanship, although in some cases they were of a more technical nature. Most of them performed certain functions in addition to the obtaining of Government contracts—they secured necessary priorities, discussed changes, expedited payments, and generally "serviced" the contracts. Even in these cases, however, the agents were seldom more than intelligent conveyors of detailed information. They seldom performed engineering services in the strict sense; indeed, they usually were not qualified, either by education or experience, to do so.* Many of the agents only opened their offices and began business in Washington at the beginning of the emergency period, attracted by the rich possibilities of making large profits in connection with the tremendously increased volume of Government business. [Italics added.]

\* \* \* \* \* \* \*

The bill H. R. 1900, as originally introduced, sought to give authority to the Secretary of the Navy to limit the amount of compensation which could be paid in connection with the negotiation or securing of a contract with the Navy Department.

The substitute bill, however, is designed to give the departments authority to control the excessive fees and profits being received by these manufacturers' representatives or commission agents, by defining their contracts or arrangements with their principals as "subcontracts" under the statute dealing with the renegotiation of war contracts, which will permit the renegotiation downward of their profits (providing their gross annual income referable to the procurement of Government contracts, or subcontracts thereunder, exceeds $25,000). *In order to encompass them all, these agents are defined in two ways: (1) Those agents who receive commissions or fees contingent upon the procurement of, or*

---

[2] H. Rept. 353, 78th Cong., 1st sess.

*amount of, the Government contracts, or subcontracts thereunder; and* (2) *those agents, any part of whose services consist of the solicitation or procurement of Government contracts or subcontracts thereunder.* This latter category would include those representatives who are on a salary or some other form of fixed compensation.

Compensation arrangements between business enterprises and their bona fide officers, partners, or full-time employees, who may represent the enterprises directly in soliciting or procuring Government business, are specifically excepted. It is felt that the compensation of these persons can be sufficiently controlled in the direct renegotiations of the business enterprises themselves, when the allowability of salaries, bonuses, commissions, and other forms of compensation is considered * * *. [Italics added.]

In debate on the floor of the House of Representatives, Chairman Vinson of the Naval Affairs Committee made the following statement to the House as a Committee of the Whole:

Now, Mr. Chairman, if there are no other questions I think the committee thoroughly understands what this bill is about. Its sole purpose is to bring these war brokers under the jurisdiction and scrutiny of the renegotiation statute by classifying them as subcontractors. This practice should be scrutinized by competent men. Those people who represent manufacturers should only receive that to which they are entitled, and not excessive fees like they are receiving now.[3]

In the Senate, Senator Walsh, who was there sponsoring the bill, stated, "The bill applies only to persons who have made tremendous sums of money by using their influence, personally and politically, to obtain contracts from our Governmment"[4] and:

* * * The representatives of various bureaus testified that the way to reach it was to require that the agent who negotiated for an excessive fee with any contractor to obtain a contract from the Government be made a subcontractor and his fee subjected to renegotiation. That is all there is to this bill. If a person collects $200,000 for a $10,000,000 contract, the bill would make him a subcontractor, and the renegotiators would decide how much of the money he had honestly earned, how much was bonus, how much was excessive, and how much was fraudulent. That is all there is to the bill. It would not change the policy or principle of renegotiating. It represents a serious and honest endeavor to reach lobbyists who are making enormous sums of money. If I had the time, I would read a list of them.[5]

With this legislative history in mind, we must determine whether the petitioners, on the basis of the four subcontracts in question, are subcontractors described in section 403 (a) (5) (B). We do not think they are as to subcontract 16 and purchase order No. 71742 merely because in the former case their fee was to be computed on the total amount of contracts approved for the construction of buildings and in the latter was based on 5 per cent of estimated costs. Certainly their fee was not "contingent upon the procurement of a contract * * *

[3] 89 Cong. Rec. 3629.
[4] 89 Cong. Rec. 5865.
[5] 89 Cong. Rec. 5864.

with a Department or of a subcontract," nor do we think it may be said that it was "determined with reference to the amount of *such* a contract or subcontract" (italics added), that is, a contract or subcontract procured by petitioners. In other words, the phrase "determined with reference to the amount of such a contract," etc., may not be isolated, as the respondent would have it, but must be construed in connection with the preceding language and in the light of the purpose sought to be accomplished by Congress. So construed, the language of the statute aptly applies to manufacturers' agents and sales engineers who procure Government contracts for their principals and whose compensation is contingent upon the business they are able to obtain for the principals or fixed by the amount of such business.

No more do we believe that subcontracts 8 and 17 bring the petitioners within the statute merely because under the terms of those contracts petitioners agreed to issue invitations to prospective bidders for the construction of the buildings they designed. These are but the usual services performed by architects and engineers, and in no proper sense do they consist of "the soliciting, attempting to procure, or procuring a contract  *  *  *  with a Department or a subcontract."

In issuing invitations to bid, petitioners are not the agents of the subcontractors who bid on the construction of the buildings, nor do they derive their compensation from such subcontractors. In other words, they are not *getting* business for principals, but are, in effect, *giving* business. The application of the statutory language to a manufacturer's agent, soliciting or procuring contracts for his principal with the Government, is clear; and the stated purpose of subpart (ii), according to the Committee Reports, was to reach those agents and representatives who worked on a salary, rather than a commission. It would be a most strained construction which would apply the statutory language to these petitioners on the basis of their architectural contracts with the Kaiser Co.

A construction of section 403 (a) (5) (B) so broad as that contended for by respondent would have the effect of precluding from a right of redetermination by this Court a number of contractors or subcontractors whose business was renegotiable before the adoption of section 403 (a) (5) (B), and would thus extend far beyond the Congressional purpose in adopting the statute. Such an intent is not lightly to be ascribed to the framers of the legislation, particularly where there is an absence of support therefor in any legislative history.

We conclude that petitioners are not subcontractors as defined in section 403 (a) (5) (B). *Iverson & Laux, Inc.*, 6 T. C. 247, upon which respondent relies, involved a manufacturer's agent, to which the statute is clearly applicable; and that case is not contrary to or in conflict with our conclusion herein. It follows that the respondent's motion to dismiss must be denied. An order will be entered to that effect.