**COMPREHENSIVE DESIGNERS, INC. and Comprehensive Designers International Limited, a consolidated group,**

v.

**The UNITED STATES**

**No. 632–71.**

United States Court of Claims.

Dec. 15, 1976.

Gordon Gerber, Philadelphia, Pa., for plaintiff. Gilbert A. Cuneo, Washington, D.C., atty. of record. James J. Gallagher, Alfred A. Gollatz, Dechert, Price & Rhoads, Philadelphia, Pa., of counsel.

Richard J. Webber, Washington, D.C., with whom was Asst. Atty. Gen. Rex E. Lee, Washington, D.C., for defendant. Robert E. Tressel, Washington, D.C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and BENNETT, Judge.

BENNETT, Judge.

This renegotiation case is before the court on the parties' cross-motions for summary judgment. The parties have stipulated that if the plaintiffs' defense-related contracts are held subject to the Renegotiation Act of 1951, as amended, 50 U.S.C. App. §§ 1211 *et seq.* (1970), then plaintiffs renegotiated as a consolidated group, see 50 U.S.C. App. § 1215(a) (1970), realized excessive profits of $1,515,000. We now hold that the contracts at issue are subject to the provisions of the Act.

The two plaintiffs, Comprehensive Designers, Inc. (CDI) and its British-based subsidiary, Comprehensive Designers International Limited (CDIL), entered into requirements contracts with American defense contractors to perform certain personnel and office supply services in their fiscal year 1967. CDI's primary contractor-client was the Lockheed-Georgia Division of Lockheed Aircraft Corporation (Lockheed);[1] CDIL's nearly exclusive client was Lockheed. At that time Lockheed was engaged in designing and building the C–5A aircraft for the Government, and was in need of additional engineering and technical personnel for a temporary period. Plaintiffs were in the business of recruiting such personnel to perform work for other firms at the firms' direction, and were awarded contracts by Lockheed under which plaintiff would submit engineers' and technicians' resumés to Lockheed. Several other contractors like the plaintiffs were also given these requirements contracts. They then competed with one another for the placement of personnel with Lockheed, for Lockheed alone determined whom it would hire, and for what duration. However, it was only upon the hiring of the employee that any profit accrued to the personnel contractor.

Plaintiffs received payments from Lockheed covering the salaries, taxes, and fringe benefits of the personnel offered by plaintiffs and hired by Lockheed, along with a profit for plaintiffs. CDIL in addition performed such functions for Lockheed as the rental of office space and the rental or purchase of office supplies and engineering equipment; it received fees covering its expenses for these functions, plus a profit. Plaintiffs carried the Lockheed-hired personnel on their payrolls and performed all the necessary tax and fringe-benefit accounting. Lockheed at all times controlled the temporary employees' working hours and activities, approved their vacations, commingled them with its permanent staff, and retained the right to terminate any or all of them without cause.

The Renegotiation Act makes subcontracts with defense contractors subject to its provisions. It defines "subcontract," in section 103(g), 50 U.S.C. App. § 1213(g) (1970), to mean "(1) any purchase order or agreement * * * to perform all or any part of the work, or to make or furnish any materials, required for the performance of any other contract [subject to renegotiation] * * * but such term does not include any purchase order or agreement to furnish office supplies * * *." A Renegotiation Board regulation, 32 C.F.R. § 1452.4(b)(1) (1967), elaborates on this definition:

> * * * An agreement * * * is a renegotiable subcontract if it is: (i) For the sale or processing of an end product which is to be delivered under a renegotiable prime contract; or (ii) for the sale or processing of materials to be physically incorporated in such end product; or * * * (v) for the performance of services directly required for the performance of prime contracts * * * included in (i) [or] (ii) * * * of this subparagraph.

Defendant maintains that plaintiffs performed services "directly required" for the

---

1. The parties have agreed to treat all of CDI's 1967 defense-related work as if performed under the Lockheed contract.

processing of a renegotiable end product or its material components when they sent qualified personnel to Lockheed to work on the C–5A's design, and then managed the related payroll accounting. Opposing this, plaintiffs argue that Lockheed's control of the temporary employees' work activities was so pervasive that the employees must be considered to have done their work in Lockheed's name alone. Defendant's response is that, no matter who was responsible for the employees' daily activities, the definition of "subcontract" in the statute and regulations is extremely broad and reaches all who contribute to creating higher prices for the Government in the course of making products for it, citing *Providence Wool Combing Co. v. Secretary of War*, 14 T.C. 979 (1950).

*Providence Wool*, an early renegotiation case, arose under the Renegotiation Act of 1942 but involved the same definition of subcontract and the same legislative history of that definition as this case. There, the Tax Court considered the scope of renegotiation sufficiently expansive to touch most every subcontractor who contributed in some fashion to the creation of the product purchased by the Government. After reviewing the legislative history of "subcontract," the court held that the term permitted the renegotiation of a wool processor who sold to private firms, having no Government contracts, but whose wool was ultimately incorporated in goods the Government bought. The court referred to the "mischief at which the legislative remedy was aimed," war profiteering, as authority to view the scope of "subcontract" expansively.

In enacting the renegotiation statute, Congress wished to deflate, retroactively, any Government-paid prices (and therefore profits) which were abnormally high due to the lack of adequate price competition in wartime conditions. *Major Coat Co. v. United States*, Ct.Cl., 543 F.2d 97 (1976). It did not want the profit-recoupment task arbitrarily stopped short of totally compensating for market aberration, as the *Providence Wool* opinion noted in speaking of the

"mischief" and the "remedy." When a subcontractor charges a defense contractor a certain price for services, that price becomes part of the price to the Government on the end product, yet it is not renegotiable as far as the prime contractor is concerned, for it is only a deductible renegotiable cost to him. If the subcontractor's abnormal profit, realized solely because of wartime conditions, cannot be recouped directly from him, it is not touchable at all. This argues, as the Tax Court recognized, for the broadest possible reading of the term "subcontract." The legislative history discussed in *Providence Wool* does not support exemption of the present personnel contracts from renegotiation.

Plaintiffs, for the benefit of CDIL's office space and supply acquisition functions, point to section 103(g)(1)'s exclusion of "agreement[s] to furnish office supplies" from the definition of subcontract. They note that the Renegotiation Board itself excludes from the definition of subcontract, agreements for office machines, furniture, and equipment, even though the statutory exclusion does not cover these items. 32 C.F.R. § 1452.4(b)(2) and (b)(3) (1967). However, these exceptions from the Act's coverage merely reflect the thought that the sale or rental of standard off-the-shelf items at commercial rates is not likely to give rise to excessive profits; the assumption is that adequate price competition will always protect the Government in this area. Plaintiff CDIL's office supply services, for a fee quite apart from the office and equipment acquisition costs, stand on a much different footing than standard off-the-shelf sales. They lie outside the exclusion and are just as rife with economic "mischief" as are plaintiffs' personnel services.

Plaintiffs insist that their services must be "integrally related" to the prime contractor's end product, or materials incorporated therein, in order to be renegotiable. In this they rely on the regulation's reference to services "*directly*" required for the performance of the prime contract, 32 C.F.R. § 1452.4(b)(1)(v) (1967), quoted above. Placing much emphasis on a "di-

rect-indirect" distinction poses many problems, for no one knows exactly where "direct" leaves off and "indirect" begins. The matter is judgmental, the inquiry is whether including a given activity in the definition becomes too attenuated, and the result is necessarily guided by policy concerns underlying the statutory and regulatory scheme. We think that the economic considerations discussed above must control the interpretation of whether a certain subcontract has a "direct" impact on the prime contract. It follows, for reasons previously stated, that plaintiffs' contracts with Lockheed fall within the provisions of the Renegotiation Act.

Plaintiffs' motion for summary judgment is denied, and defendant's cross-motion is granted. We conclude and determine that plaintiffs realized excess profits in the amount of $1,515,000, for the fiscal year ended April 30, 1967, less appropriate credits to plaintiffs for federal and state taxes, and otherwise, as agreed in the parties' stipulation filed September 23, 1976. The net amount owed to defendant will bear interest as stipulated.[2]

---

2. The stipulation recited that the court would also be asked to consider plaintiff's eligibility for exemption from renegotiation under section 106(e)(1)(B) and (4)(C) of the Act, 50 U.S.C. App. § 1216(e)(1)(B) and (4)(C) (1970), relating to exemptions for so-called standard commercial services. Since neither party has mentioned plaintiffs' eligibility for such exemption either in the briefs or at oral argument, we consider the point waived and decline to address it.