COOPER–MACDONALD, INC.

v.

The UNITED STATES.

No. 88–75.

United States Court of Claims.

July 8, 1977.

As Amended on Denial of Rehearing Sept. 30, 1977.

Numa L. Smith, Jr., Washington, D. C., attorney of record, for plaintiff; Barron K. Grier, James W. Midgley, and Miller & Chevalier, Washington, D. C., of counsel.

C. Max Vassanelli, Washington, D. C., with whom was Acting Asst. Atty. Gen. Irving Jaffe, Washington, D. C., for defendant; Don W. Crockett, Washington, D. C., and William A. Schmidt, of counsel.

Richard R. Molleur, Washington, D. C., attorney of record, for Fairchild Industries, Inc., amicus curiae.

Before DAVIS, Judge, SKELTON, Senior Judge, and KASHIWA, KUNZIG and BENNETT, Judges, en banc.

## ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge:

Plaintiff Cooper-Macdonald, Inc. is a manufacturer's representative in the sale of American firearms; certain of its contracts with American companies have been declared renegotiable by the Renegotiation Board and excessive profits under them found for the fiscal years 1969–1971. By this motion for summary judgment, plaintiff asks the court to hold as a matter of law that these arrangements were not renegotiable at all, and if they were they fell under certain limited provisions of the Renegotiation Act of 1951, 50 U.S.C. App. § 1211 et seq., which established larger monetary floors for renegotiation.

For the motion, we take the following facts to be uncontroverted: [1]

In 1958 plaintiff (which we shall sometimes call C–M) was associated with Fairchild Engine and Airplane Corporation (and its related Canadian affiliate) to promote, in Cooper-Macdonald's foreign sales territories, a certain Fairchild rifle. At that time plaintiff learned of another rifle developed by Fairchild, now known as the M–16, which C–M considered to have great potential especially in Asia. Fairchild did not wish to make the M–16 itself and asked plaintiff to find an experienced manufacturer who would. Cooper-Macdonald then arranged with Colt's Patent Fire Arms Manufacturing Company, Inc. (Colt's) to obtain rights to both of Fairchild's rifles. After tripartite negotiations, Fairchild and Colt's signed an agreement in 1959, amended in 1961, granting Colt's, for a term extending at least until the expiration of the last-to-expire patent, the "exclusive right to make, use and sell" the two rifles throughout the world, in return for which Colt's was to pay Fairchild specified sums per item.

At about the same time plaintiff made separate agreements with both Fairchild and Colt's. In consideration for C–M's bringing together the latter two companies, Colt's undertook to pay plaintiff a certain amount for each rifle made and sold by Colt's and for which Colt's was required to pay Fairchild. The Cooper-Macdonald-Colt's agreement granted C–M the exclusive right to sell the rifles within plaintiff's particular sales territory (Asia, Australia, Pacific Islands, Libya).

Sometime later, at the request of both Fairchild and Colt's, plaintiff agreed to try to obtain United States technical approval of the M–16. In this connection, Cooper-Macdonald entered into additional agreements with Fairchild and Colt's. The former (dated August 30, 1960)—the Fairchild-Cooper-Macdonald contract directly pertinent to this case—undertook to pay plaintiff (in addition to other compensation) 10% of royalties received by Fairchild from sales to the United States or from sales to for-

---

1. We state only the facts necessary to our decision. Each party has put ·forward a host of other factual allegations which may bear on the amount of renegotiable profits, if any, but do not, as we now see it, relate to the purely legal issues we have before us at this stage.

**578**

eign governments which could not be effected without United States technical approval of the M–16. The further contract between Colt's and C–M (as made in letter agreements in 1960 and 1961, later superseded) provided for payments from the former to the latter on sales to the United States.

In 1962 the United States Air Force adopted the M–16 and bought a considerable number from Colt's. The Army followed suit in 1963 as a "one-time buy", and then beginning in 1965 much more widely for the forces in Vietnam; ultimately the Federal Government agreed to purchase M–16's up to Colt's production capacity and also obtained the exclusive right to make foreign sales of the item.

Meanwhile, Colt's and Cooper-Macdonald reconstituted their arrangements *inter se.* In an agreement of August 1, 1963—the Colt's-Cooper-Macdonald agreement governing a large portion of this case, superseding the 1958 and 1960–1961 pacts referred to above—Colt's acknowledged that C–M (1) was instrumental in bringing about the Colt's-Fairchild agreements of 1959 and 1961, and (2) performed a valuable service by promoting the use of the M–16 by the U.S. armed forces and in developing a market for it. In consideration of the second of these two types of service, Colt's was to pay $250,000 in 24 installments. For the service of helping with the Colt's-Fairchild agreements, plaintiff was to receive separately from Colt's 1% of the selling price of rifles sold by it under the Colt's-Fairchild agreement.[2] After the Federal Government undertook to make all foreign sales of the M–16, the Colt's contract giving plaintiff sales rights in foreign territory was terminated in 1967.

During the renegotiable years (1969–1971), plaintiff received revenues under the 1% provision of the Colt's-Cooper-Macdonald agreement of August 1, 1963 (*see* foot-

note 2, *supra*) and also amounts under the Fairchild-Cooper-Macdonald contract of August 30, 1960. The Renegotiation Board found these sums renegotiable, and excessive profits for each year ($1,000,000 for 1969, $1,200,000 for 1970, $350,000 for 1971). Plaintiff now puts to us the legal contention that no part of the profits under these agreements was subject to renegotiation.

I

Since Cooper-Macdonald had no prime contracts with the Federal Government, the issue is whether its individual agreements with Fairchild and with Colt's were "subcontracts" as defined in the 1951 Renegotiation Act. The plaintiff's overriding argument is that the Colt's-Fairchild agreement was not a mere license but a non-renegotiable sale of patent rights and therefore that the subordinate arrangements with Colt's and Fairchild could not be "subcontracts" under the statute. The Government agrees that, if the Colt's-Fairchild agreement was a true sale, it was not itself renegotiable (*see* Renegotiation Board, Renegotiation Ruling No. 5, 32 C.F.R. § 1499.1–5(a)(1)(i)), but denies that the arrangement was a sale. The initial question in the case is, therefore, whether the Colt's-Fairchild contract was subject to renegotiation.[3]

The Colt's-Fairchild arrangement which applied to plaintiff's profits for 1969–1971 was the agreement as amended on December 12, 1961, not the earlier one dated January 7, 1959. The latter was wholly supplanted by the former, and no longer existed in 1969–1971. Defendant says that plaintiff had little or nothing to do with bringing about the December 1961 replacement. It is not clear that this is so but in any case the fact, if it be one, is irrelevant. The payments Cooper-Macdonald obtained in the renegotiable years were generally for bringing Fairchild and Colt's together—not for helping with the January 1959 agree-

---

**2.** All the amounts plaintiff received from Colt's for 1969–1971, involved in this renegotiation proceeding, were paid and received under this 1% provision.

**3.** We put off for later discussion (Parts II and III, *infra*) the issue of whether C–M's subordinate arrangements would still be renegotiable even if the Fairchild-Colt's agreement was not itself renegotiable.

ment as distinguished from the one made in December 1961. To the extent the arrangement between those two firms is pertinent to the renegotiability of plaintiff's 1969–1971 profits, it is the Colt's-Fairchild bargain as it existed during those years, not the previous compact which had died several years before and was no longer vital in any aspect. In comparable situations the Renegotiation Act seems to suggest that, where renegotiability of a subcontractor's profits turns on the status of a prime or upper-tier agreement, the determinative date is not when the latter was first made but its posture during the renegotiable period. *See* section 102(a), 50 U.S.C. App. § 1212(a); section 102(c)(2), 50 U.S.C. App. § 1212(c)(2).

Putting renegotiation aside, we would have no difficulty in characterizing the December 1961 Colt's-Fairchild agreement as a sale for general purposes of the law. The instrument granted Colt's an exclusive license to make, use and sell the patented rifles anywhere in the world, up to the expiration date of the last-to-expire patent; this included the right to grant sub-licenses but did not cover the right to reassign the patent or the agreement.[4] The grant of the exclusive license to make, use and vend throughout the world is the signal component because "a patent confers upon the owner the right to exclude others from making, using or selling the invention during the life of the patent, and in order that a transfer constitute a sale, there must be a grant of all substantial rights of value in the patent." *Bell Intercontinental Corp. v. United States,* 381 F.2d 1004, 1010, 180 Ct.Cl. 1071, 1077 (1967). *See Waterman v. Mackenzie,* 138 U.S. 252, 255–56, 11 S.Ct. 334, 34 L.Ed. 923 (1891), on the significance of a grant of an exclusive right to make, use and vend in a geographical area. If that is what is done, it is not important that the agreement may refer to itself as a license rather than a sale. *Waterman v. Mackenzie, supra,* 138 U.S. at 256, 11 S.Ct.

334; *Bell Intercontinental Corp. v. United States, supra,* 381 F.2d at 1011, 180 Ct.Cl. at 1077. The method of payment is not controlling, so that a sale can have payments based on a percentage of sales by the grantee or of his profits, or an amount per unit (*Bell Intercontinental Corp. v. United States, supra,* 381 F.2d at 1011, 180 Ct.Cl. 1077). Nor does it negative the transaction's characterization as a sale that the grantee may not assign its full rights in the patent (*id.,* 381 F.2d at 1017, 180 Ct.Cl. at 1087–88) or that infringement suits should be brought in the name of the grantor (*id.,* 381 F.2d 1015–16, 180 Ct.Cl. at 1085). It is likewise irrelevant, on the issue of sales *vs.* license, that Colt's, the grantee, could convert its exclusive license to a non-exclusive one by reducing the amount of the sums it paid (*id.,* 381 F.2d at 1011, 180 Ct.Cl. at 1078); such a device was simply a condition subsequent causing title to revest in the transferor. By the same token the sale was not destroyed by the provision that Fairchild, the grantor, could recapture the patent's title if Colt, the transferee, defaulted. *Littlefield v. Perry,* 88 U.S. (21 Wall.) 205, 220, 22 L.Ed. 577 (1874); *Bell Intercontinental Corp., supra,* 381 F.2d at 1011, 1015, 180 Ct.Cl. at 1078, 1085. In brief, there would be no doubt, if this were a tax, contract or patent case, that the Fairchild rifle patents were sold and assigned to Colt's by the agreement of December 12, 1961.

The Government's position is that the matter is different for renegotiation because the Board has promulgated a regulation excluding from the concept of a sale (for renegotiation purposes) "a transaction involving the retention of a security title to insure the vendor against loss upon a default in payment, or of a right of recapture upon default." Renegotiation Ruling No. 5, 32 C.F.R. § 1499.1–5(a)(2) and (b).[5]

The Tax Court, faced with this very problem, refused to allow the Renegotiation

---

4. It is unclear that the bar on reassignment had much substance since Colt's could sub-license to another firm the entire right to make, use, and sell the rifles.

5. The Ruling goes on to say: "On the other hand, retention of a vendor's lien is not inconsistent with an absolute sale and will not of itself subject the transaction to renegotiation."

Ruling to make a difference with respect to a transaction indistinguishable in substance from the one now before us. *Transducer Patents Co. v. Renegotiation Board,* 58 T.C. 329 (1972). The Ninth Circuit affirmed. 492 F.2d 247 (1974). The Tax Court (58 T.C. at 347–48) considered the Ruling inconsistent with *Littlefield v. Perry, supra,* and *Waterman v. Mackenzie, supra,* and added that there was nothing to indicate that Congress was concerned (in the renegotiation legislation) with the type of arrangements the assignor of a patent might devise to secure his assignee's performance. In affirming, the Court of Appeals said that the Tax Court had "applied well-settled case law" in holding that the agreement "though in terms a license, was in actuality a sale." 492 F.2d at 249. Although it did not in terms refer to the Renegotiation Ruling as invalid, the circuit court's final opinion equated the right of recapture with a vendor's lien, followed *Littlefield v. Perry, supra,* that a forfeiture might be enforced for nonpayment or other nonperformance "as for condition broken, but until it was enforced the title granted remained in the assignees", and ended by declaring that the Tax Court's decision was "consistent with law." 492 F.2d at 250–51.

■ We agree with the Tax Court and the Ninth Circuit. To the extent the regulation attempts to deny the character of a sale to a patent arrangement simply because it contains a right of recapture, the Ruling cannot be enforced. Assuming as we do that the regulation must be sustained so long as it is "reasonably related to the purposes of the enabling legislation" (*Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1661, 36 L.Ed.2d 318 (1973)), we see this part of the Ruling as inconsistent with the Congressional treatment of patents in the Renegotiation Act and unsupported by any of the purposes of that statute. The Board itself says in Ruling No. 5: "Plainly, Congress did not intend that sales of patents, providing for the present unconditional transfer of title from the owner to the purchaser, should be subject to renegotiation." 32 C.F.R. § 1499.1–5(a)(1)(ii). It is just as plain to us that, in excluding sales of patents, Congress meant the concept of a patent sale to have the same meaning as had been developed during many decades, under the Supreme Court's aegis, for use in the law generally, *i. e.* for patent law, the law of taxation, the law of contracts, etc. There is no indication whatever, as the Tax Court pointed out in *Transducer, supra,* that Congress intended a patent sale for renegotiation purposes to be different from the sale of a patent for all other ends.

■ The only purpose defendant gives us for the no-recapture provision in the Renegotiation Ruling is that, without it, two parties in the position of Fairchild and Colt's, but who secretly intended no more than a term license, *e. g.,* for four years (which would clearly be renegotiable), could collude to avoid renegotiation by purporting to sell the patent for installment payments, including a right of recapture, with the pseudo-assignee then defaulting by prior arrangement at the end of the four years, and the pseudo-assignor then recapturing pursuant to the preconceived secret plan. The objective of the no-recapture clause is said to be to forestall such circumvention of the Act. As plaintiff points out, if firms are really bent on collusion of this type they could simply omit the recapture provision and agree undercover for the patent to be reconveyed after the secret term. The point is that collusion of this kind will not be avoided or neutralized by insisting that there be no recapture provision, but that *bona fide* patent sales, such as we have to assume the Fairchild-Colt's transaction to be, will be rendered renegotiable despite their statutory exclusion which the Board itself expressly recognizes. The more general point is that this variety of collusion, to the extent it exists at all, would be no more important for renegotiation than for tax, patent, and contract law which have not found it necessary or appropriate to embody such an anti-recapture component in the definition of a patent sale. The thin sliver of purported policy which defendant presents is thus not enough to outweigh the much stronger assumption that Congress

accepted the traditional sense of a patent-sale for renegotiation, as well as for the other branches of the law. We hold, therefore, that the Colt's-Fairchild agreement pertinent to this case was a non-renegotiable sale.

## II

■ In its last brief, defendant concedes that the payments from Fairchild to Cooper-Macdonald are not renegotiable in the latter's hands if the Fairchild-Colt's agreement is not renegotiable. Since that is the conclusion we have reached in Part I, *supra,* the Fairchild payments will be excluded from the renegotiation proceeding in this court. We accept the defendant's concession because Fairchild (unlike Colt's) had no relevant renegotiable contract with a Department or agency to which the Fairchild-Cooper-Macdonald agreement could be a related "subcontract"; similarly, the Fairchild-Cooper-Macdonald agreement was not a "subcontract" related to any of Colt's renegotiable prime contracts within the proper application of § 103(g) of the Act, 50 U.S.C. App. § 1213(g).

## III

■ This leaves the payments by Colt's to plaintiff, sums which defendant continues to insist are renegotiable even though the Fairchild-Colt's agreement is held to be not renegotiable in itself. Colt's had prime renegotiable contracts for 1969–1971 with the Government, and the question is whether the Colt's-Cooper-Macdonald agreement of August 1, 1963·(under which Colt's paid plaintiff in 1969–1971) is to be considered a statutory "subcontract" directly under those prime agreements. If there is such a direct relationship between Colt's prime business and its subsidiary agreement with C–M, then it would be irrelevant that the Colt's-Fairchild pact was a sale not subject to renegotiation. Being directly under Colt's prime contracts, the Colt's-C–M agreement, if a statutory "subcontract," would be a negotiable "related subcontract" covered by § 102(a) of the 1951 Act, 50 U.S.C. App. § 1212(a).

We posit our discussion of this problem on two basic premises undisputed in the case as it has been argued: first, the Fairchild patents were essential to Colt's production of the rifles sold to the Government, and plaintiff was being paid in 1969–1971 for helping Colt's to obtain its patent agreement with Fairchild; and, second, plaintiff was not being paid in the renegotiable years for promoting the M–16 rifle and developing a market for its use, including its acceptance by the Government, but only for helping obtain the Fairchild patents for Colt's.[6]

---

**6.** The August 1963 Colt's-Cooper-Macdonald agreement recited:

"D. Cooper-Macdonald has extensively promoted the use of the AR–15 [M–16] rifle by the U.S. Armed Forces. * * *"

"E. Colt acknowledges that the services rendered by Cooper-Macdonald were valuable in the promotion of said weapon and the development of a market for its sales and use. The parties now wish to revise and redefine their obligations and responsibilities to each other in light of the past services of Cooper-Macdonald to Colt in obtaining the license to manufacture and sell the AR–15 rifle, and in having promoted its acceptance by the U.S. Army, Navy, Air Force and other potential users."

However, as indicated *supra,* the payment provisions of the agreement were divided into two separate categories. Paragraph 2 declared that "In consideration of the market development work * * * performed by Cooper-Macdonald to promote the sale of Rifles to U.S.

Government and other users," $250,000 was to be paid by Colt's to Cooper-Macdonald in 24 installments. All of these payments were made prior to the renegotiable years. Paragraph 3 then provided, "[i]n consideration of all services performed by Cooper-Macdonald in bringing about agreements between Fairchild * * and Colt," for the payment by Colt's of 1% of the price received by Colt's from the sale of its rifles anywhere in the world. The payments received by plaintiff during the years in review were all received under paragraph 3.

On this motion for summary judgment, defendant has not claimed, or presented any materials tending to show, that any part of the payments under paragraph 3 was in fact made for promoting the acceptance of the rifles by the Government or for developing the government market.

Nor has the defendant urged that (if the Colt's-Fairchild agreement is not renegotiable) the whole Colt's-Cooper-Macdonald agreement falls under § 103(g)(3)(C) ("any contract or

Defendant's candidate for coverage (among the five "subcontract" definitions in the Renegotiation Act of, 1951) is § 103(g)(3)(B), 50 U.S.C. App. § 1213(g)(3)(B):

> The term "subcontract" means—* * "any contract or arrangement * * * under which—* * * any amount payable is determined with reference to the amount of a contract or contracts with a [designated] Department or of a subcontract or subcontracts." [7]

Literally, the Colt's-Cooper-Macdonald agreement falls well within this definition. The amount payable to plaintiff (insofar as renegotiable) is determined with reference to the amounts paid to Colt's under its prime contracts with named Departments. The Government sees the conclusive answer in this literal application of subsection (B). Plaintiff's counterfoil is that history requires a narrower meaning to be attributed to the provision despite its broad phrasing.

The history starts with the related "subcontract" provision of the 1943 Renegotiation Act (as amended).[8] This differed in format in that (a) what later became sub-

paragraphs A and B in the 1951 Act were joined in one subparagraph, and (b) the analogue of the 1951 subsection B used the wording "*such* a contract or subcontract or *such* contracts or subcontracts," leaving unclear the precise type of contract to which "such" referred (*i. e.*, any renegotiable contract or only those renegotiable contracts procured by the party sought to be renegotiated).

In *Wolff v. Macauley*, 8 T.C. 146, 151–52 (1947)—not involving a broker like Cooper-Macdonald but architects who prepared plans for and serviced renegotiable contracts—the Tax Court decided that "*such contract* " harked back only to one procured by the party sought to be renegotiated under this particular clause—that the statutory words "determined with reference to the amount of *such* a contract" applied only "to manufacturers' agents and sales engineers who procure Government contracts for their principals and whose compensation is contingent upon the business they are able to obtain for the principals or fixed by the amount of such business." 8 T.C. at 152.

---

arrangement * * * under which * * * any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring a contract or contracts with a Department or a subcontract or subcontracts") simply because part of the services covered by that August 1, 1963 agreement were for market development and promotion. Plaintiff says that paragraphs 2 and 3 are severable but perhaps an argument could be made that nevertheless § 103(g)(3)(C) applies (*see French v. War Contracts Price Adjustment Board*, 13 T.C. 276, 280, 281 (1949)); we do not understand defendant to be making that contention in opposition to this motion.

7. The "subcontract" part of the 1951 Renegotiation Act (§ 103(g), 50 U.S.C. App. § 1213(g)) sets forth five separate definitions of a renegotiable subcontract:

Paragraph (1) refers to orders or agreements for performing the work or furnishing supplies (it is briefly discussed *infra* in Part IV);

Paragraph (2) covers the right to use patented or secret methods, etc. (it is considered in Part IV, *infra* ).

Paragraph (3) includes three subparagraphs. Subparagraph (A) covers agreements in which any amount payable is contingent upon the procurement of a renegotiable contract or subcontract (it is briefly noted at the end of this Part III, *infra* ). Subparagraph (B), discussed

at length in the text, is the prime focus of this segment of the case. Subparagraph (C) is quoted in relevant part in footnote 6, *supra*, and relates to agreements for soliciting or procuring renegotiable contracts or subcontracts (it does not seem to be relied upon by defendant in the present motion, *see* footnote 6, *supra* ).

It is important to note that, for subcontracts covered by paragraphs (1) and (2), the renegotiable floor is $1,000,000 per year for 1969–1971, while the floor for the three types covered by paragraph (3) is $25,000 per year (§ 105(f)(1) and (2), 50 U.S.C. App. § 1215(f)(1) and (2)).

8. That earlier provision was as follows:

"Any contract or arrangement * * * (i) any amount payable under which is contingent upon the procurement of a contract or contracts with a Department or of a subcontract or subcontracts, or determined with reference to the amount of such a contract or subcontract or such contracts or subcontracts or (ii) under which any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring· a contract or contracts with a Department or a subcontract or subcontracts * * *."

This interpretation was continued by the full Tax Court, over a three-judge dissent, in *Fine v. War Contracts Price Adjustment Board*, 9 T.C. 600, 607–08 (1947).[9] The same general theme was reiterated, by way of dictum, in *French v. War Contracts Price Adjustment Board*, 13 T.C. 276, 280–81 (1949).

Cooper-Macdonald urges that we carry over the same reading to the partly different language and format of § 103(g)(3)(B) of the 1951 Act, 50 U.S.C. App. § 1215(g)(3)(B), which omits the word "*such* contract" and unlike the earlier Act places those subcontracts on which the amount payable "is determined with reference to the amount of a" renegotiable contract (or subcontract) in a separate subparagraph. Plaintiff downgrades these textual changes by emphasizing the parts of the legislative history tending to show that no substantive change was intended in 1951: (a) the statement of Representative Vinson, a chief sponsor of the 1951 Act, that "In essence, renegotiation under this bill will be substantially identical with renegotiation carried on under the 1943 Renegotiation Act" and "The definition of a subcontract contained in this bill is substantially identical with that contained in the 1943 Act" (Hearings on H.R. 9246 before the House Committee on Ways and Means, 81st Cong., 2d Sess. 16 (1950)); (b) references by the principal executive witness to bringing "brokers and dealers under renegotiation," including "the so-called 5 percenters," without any suggestion that the Tax Court decisions would be overturned or changed (*id.* at 63); and (c) the absence in the Committee reports of any indication that the Tax Court rule was to be modified. On the basis of this history, plaintiff invokes the

rule that, where statutes are revised or consolidated, a change in phraseology or form will ordinarily not create a change in the law unless the legislative purpose to do so is plain (*see, e. g., Muniz v. Hoffman*, 422 U.S. 454, 467–68, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975)).

Defendant, on the other hand, denies that the 1951 Act was a reenactment or recodification of the 1943 statute, urging rather that it was only "modeled generally after the World War II Renegotiation Act" (97 Cong.Rec. 582, Jan. 23, 1951, Cong. Allen) and though following very closely the framework and details of the World War II Act "it contains a series of changes from the World War II law which experience has indicated are desirable under the present circumstances" (Sen. Robertson, 97 Cong. Rec. 1349, Feb. 19, 1951).[10] The Government points, too, to a colloquy on the Senate floor between Senator George, a sponsor of the bill, and Senator Langer which seems to imply that persons who assisted in servicing renegotiable contracts, but need not themselves have been involved in their procurement, would be covered by these particular subcontract provisions. 97 Cong. Rec. 1341, Feb. 19, 1951.[11] Defendant minimizes the failure to refer expressly to a change in these subcontract provisions by calling the modification relatively insignificant for the renegotiation process as a whole—this is the first time in 25 years under the 1951 Act that the issue has been raised.

We have determined that the legislative history is not conclusive either way but that Congress, in 1951, did make some change from the Tax Court's rulings under the World War statute, perhaps not so far as

---

**9.** Like *Wolff, Fine* did not involve a broker but a manufacturer's agent who performed substantive field services in connection with the performance of his principal's contracts (which he did not help procure).

**10.** Senator Robertson added: "I am informed that the bill represents the view and thinking of a wide number of persons both within and without the Government who had *extensive* experience with the renegotiation of war contracts during World War II."

**11.** The proposal (as does the Act) imposed a floor of $25,000 per fiscal year for renegotiability under § 103(g)(3). Senator Langer offered an amendment to substitute a $25,000 lifetime floor. As we read the Congressional Record, Senator George opposed the amendment on the ground that the yearly floor would protect engineers and accountants who properly helped service renegotiable contracts but, apparently, were not concerned in their procurement.

defendant urges but still farther than plaintiff is willing to go. It is highly probable that the drafters of the 1951 Act—in the executive branch—wished to depart from the Tax Court's position. That tribunal had specifically said, in *Fine v. War Contracts Price Adjustment Board, supra,* 9 T.C. at 608, that the Government wanted to read the pertinent clause in the 1943 Act as if it were phrased "determined with reference to the amount of a contract with a Department or subcontracts or contracts with a Department or subcontracts"—and then the court proceeded to reject that reading because the statute was not framed in that way, but instead used the term *"such* contract" which refers back only to agreements procured by the renegotiatee. In 1951 the Administration bill and the Act as passed contain the very same wording (with a miniscule alteration) which the Tax Court emphasized was not contained in the earlier legislation. It is hard to escape the conclusion that the drafters intended to put into the new law the phrasing and the meaning which the Tax Court pointedly said had not been embodied in the older legislation.

Plaintiff does not deny that this was probably the executive drafters' purpose but answers that the new interpretation was never communicated to the Congress which was not explicitly told, so far as the records reveal, that this modification was contemplated. This argument has weight, of course, but we do not think it can prevail of itself. There is no indication that Congress was at all aware of the Tax Court's *Wolff, Fine,* or *French* decisions, let alone that it accepted or approved them. The earliest of those opinions was about four years old when the 1951 Act was going through Congress, and the rule they imposed cannot be considered long-established, well-known, or encrusted into the statute. The disputed segment of renegotiation "subcontract" law was very narrow, not one of wide effect. Congress knew in 1951 that changes were being made from the 1943 statute, and there is no indication that every change was to be mentioned or was actually mentioned in the hearings, reports,

or debates. True, the statement was made that the "subcontract" definition was "substantially identical with that contained in the 1943 Act," *supra,* but that generality, with its modifying adjective "substantially", could cover this minor modification; Senator George, an important and presumably knowledgeable sponsor, seems to us to have understood that the proposed language would cover at least some non-procuring subcontractors whose compensation was measured by the amount of renegotiable contracts. *See* footnote 11, *supra.*

Nor can we accept as decisive plaintiff's analogy to statutory revisions, codifications, and consolidations. This was not such but a new measure (after a gap of some years) for a new period, "modeled generally" on the prior Renegotiation Act but also containing "a series of changes from the World War II law which experience has indicated are desirable under the present circumstances." *See supra.* In particular, the recent Supreme Court cases cited by plaintiff both involved true revisions (of the Judicial and Criminal Codes in 1948) in which every change in the text was explained in the Revisers' Notes, and express statements were made by persons important in the revision that no changes of law or policy were to be presumed from mere language changes unless an intent to make such changes was clearly expressed. *Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 226–28, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957); *Muniz v. Hoffman,* 422 U.S. 454, 469, 472, 473–74, 95 S.Ct. 2178, 45 L.Ed.2d 319 (1975). Moreover, the alleged changes rejected in those decisions were unexplained modifications of clear and well-settled Congressional choices or Supreme Court rulings, not as here recent decisions of a lower court (interpreting a subtle ambiguity) which we cannot even say were known to the Congress.

Putting aside these inapplicable and artificial rules of construction (advanced by plaintiff) which would give the heaviest of weight to the Tax Court's then recent read-

ing of the earlier statute,[12] we are moved to apply the normal understanding of subparagraph (B) of § 103(g)(3) to this plaintiff because that interpretation seems to us to accord in this instance with the dominant Congressional purpose in the Renegotiation Act as a whole, as well as with an important objective in § 103(g)(3) in particular. As we have said, use of the Fairchild patents was all-important to Colt's in making the M–16 and selling it to the Government. Cooper-Macdonald thus helped Colt's to obtain a prime contract essential in the latter's renegotiable business. In addition, plaintiff's compensation was directly linked to the sums Colt's received from the Government so that Cooper-Macdonald's receipts would soar in exact proportion with Colt's renegotiable receipts. If the plaintiff had aided Colt's to get another necessity (such as metal or wood, or help in obtaining a genius engineer as an employee), there seems little doubt that Colt's comparable percentage payments to plaintiff for such services would be intended to be renegotiable. It would make no difference that the subcontractor had not aided Colt's in getting the defense business; the significant factors are that the sub could be helping the prime to obtain a performance essential, and the sub's compensation would rise sharply as the prime's profits peaked.

We can see no reason why Congress would want to bypass payments by a prime contractor for help in obtaining intangible components essential to production such as the Fairchild patents. Payments of that kind are very likely to add to the Government's cost of procuring the end item [13] and any excessive portion, if not recoverable from the subcontractor itself, could not be gotten back from the prime and would therefore not be "touchable at all." See Comprehensive Designers, Inc. v. United States, 545 F.2d 1283, 1285, 212 Ct.Cl. ——, —— (1976). Even if the inflationary impact on the Government is disregarded, it is hard to forget the evil effect of such potentially enormous defense excessive profits on the morale of the armed forces and the civilian population. See Lichter v. United States, 334 U.S. 742, 763, (n.7), 769, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948). There is no reason of principle or expediency to exclude from the concept of "subcontractor" someone in plaintiff's position, and we have no sufficient reason to think (aside from plaintiff's theoretical argument based on the prior Tax Court rulings, which we have rejected) that Congress intended to exclude that group in 1951. We believe, in other words, that if Congress had been specifically faced in 1951 with the question of whether Colt's payments to plaintiff should be renegotiable it would not have hesitated to respond affirmatively.

■ The statute can, without textual difficulty, be understood to carry out that intention. Of the five "subcontract" clauses of the 1951 Act, subparagraph (B) of § 103(g)(3) most clearly fits this case and fits it best (as it has been presented to us). We have already pointed out that the language of the subparagraph covers plaintiff perfectly. An important objective of the subparagraph, as we sense it, is to blanket arrangements for broker services to the prime (or higher tier subcontractor) (a) directly related to the latter's performance of

12. We do not say that the 1951 Congress necessarily overturned the Tax Court's results in Wolff and Fine. What we say, more narrowly, is that the provisions of the 1951 legislation should not be read as necessarily incorporating into the new Act the Tax Court's broad reasoning that all the subdivisions of what is now paragraph (3) of section 103(g) relate only to persons who procured or attempted to procure renegotiable contracts. Our position is that the 1951 Act should be applied to this case free of any binding effect of the Tax Court's broad rationale, which was in large part based on the different wording of the 1943 statute.

13. Plaintiff cites materials tending to show that the Government did not permit Colt's to include the C–M payments in calculating the costs of the rifles but insisted that those payments came out of Colt's profits. That special treatment of the payments in this case does not negative the general proposition that such payments are likely to increase procurement costs and thus would be within Congress's overall contemplation. In any event, Colt's was allowed to deduct the C–M payments in its own renegotiation proceedings and thus got a cost-type benefit for those payments, to the putative disadvantage of the Government.

its renegotiable agreements and (b) where the broker sub's compensation is directly tied to the prime's compensation so that the more the latter makes the more the former will get. Plaintiff gives us some examples of cases which could fall literally under subparagraph (B) but in which (according to plaintiff) it is improbable that Congress would demand renegotiability under that clause, but unlike this case none of those instances concerns a broker who helped the prime obtain a component essential to the performance of his prime contracts with the Government.[14] As a whole, paragraph (3) of § 103(g) is directed, in large part though perhaps not wholly, at non-performing brokers—those who bring two interested parties together so that performance can ensue—and at the least paragraph (B) seems to zero in on such brokers who do not themselves perform but who help the prime get the wherewithal to perform, and whose compensation is keyed on an ascending scale to the prime's receipts from the Government. Both this court and the Tax Court have suggested that the "subcontract" provisions of the Renegotiation Act should receive a broad reading so as to include all sums likely to add to the Government's costs (*Comprehensive Designers, Inc. v. United States, supra*, 545 F.2d 1283, 1285, 212 Ct.Cl. ——, —— (1976); *Providence Wool Combing Co. v. Secretary of War*, 14 T.C. 979 (1950)), and, in the light of its text and general objectives, we adopt that approach for subparagraph (B).

■ Why would Congress single out brokers like Cooper-Macdonald for placement under § 103(g)(3), with its $25,000 yearly floor, rather than putting them under the other "subcontract" paragraphs with a million-dollar floor? We cannot say for sure but we do know that neither paragraphs (1) or (2) (which have the larger minimum) fits this case without very considerable strain (*see* Part IV, *infra* ), while paragraph (3)(B) fits very easily. We also think, as explained above, that, at least in 1951, Congress did not wish to have persons like Cooper-Macdonald free of all renegotiation. We know, too, that in 1943 and presumably also in 1951 Congress seems to have been particularly keen on renegotiating contingent-fee nonperforming brokers whom it assumed were especially likely to obtain excessive compensation. See the excerpts from the 1943 legislative history quoted in the *Wolff* case, *supra*, 8 T.C. at 150–51, and the dissent in the *Fine* case, *supra*, 9 T.C. at 610. Little in the legislative history adverts to our precise type of case or suggests directly that a person like Cooper-Macdonald would be renegotiable,[15] but, on the other hand, the only parts of the history plaintiff invokes are generalizations in 1943 about reaching brokers who helped procure war contracts. The latter were admittedly of prime concern in 1943, and perhaps also in 1951, but the question is whether they were the sole focus either in 1943 or in 1951 when the wording was broadened. We think not, at least in 1951. Thus, application to this case of the literal wording of subparagraph (B), far from departing from the legislative purpose, seems to us to be within the ambit of Congressional interest.

In sum, our conclusion that subparagraph (B) applies to plaintiff's contract of August 1963 with Colt's rests on these legs:

14. One example is an attorney who happens to work on the formulation of the prime's renegotiable contract and whose compensation depends on the amount of that contract; another illustration is of a sub who works solely on the non-renegotiable facets of a conglomerate's business but whose compensation is a percentage of the conglomerate's total sales, including its renegotiable business.

Plaintiff cites part of the legislative history of the insertion of § 103(g)'s forerunner in the 1943 Act—to show that not all persons whose compensation depended on the amount of the prime's contract were to be renegotiated under these "broker" provisions—but that portion of the history refers to persons who participated in the *negotiation* of the prime's renegotiable contracts, not in their *performance.*

15. The House Committee report on the original 1943 "broker" provisions, H.R. Rep. 353, 78th Cong., 1st Sess. (quoted in *Wolff, supra,* 8 T.C. at 150–51) did say, however, that the provisions covered "agents who receive commissions or fees contingent upon the procurement of, *or* amount of, the Government contracts, or subcontracts thereunder" (emphasis added).

(a) In all probability Congress desired to subject such an agreement, directly and significantly related to the prime's performance of its renegotiable business, to testing for excessive profits;

(b) in its phasing subparagraph (B) of § 103(g)(3) of the 1951 statute fits this August 1963 agreement snugly, while paragraphs (g)(1) and (2) do not;[16] and

(c) although the different text of the 1943 Act together with its legislative history could reasonably be read as limiting the 1943 "broker" provisions to persons who helped procure renegotiable contracts, still the 1943 history is consistent in overall objective with application of the new (1951) subparagraph (B) to Cooper-Macdonald, and the 1951 history does not negative that reading; to put it another way, the legislative history is compatible with both readings and the difference in phraseology makes the difference in result.

A word should be said about subparagraphs (A) and (C) of § 103(g)(3).[17] It is hard to tell how far defendant relies on those clauses in this motion for it concedes, at least for the purposes of the motion, that the payments plaintiff received in 1969–1971 were not for procuring or helping to obtain federal business. However, at the same time it appears to suggest that if a trial shows that plaintiff did help to bring about Colt's defense contracts[18] then (A) and (C) would apply even to 1969–1971. Leaving that question wholly untouched, we also add a reservation as to each clause, based hypothetically on defendant's current view that plaintiff had no substantial part in obtaining defense business for Colt's. Even on that assumption, it is arguable that

"contingent upon the procurement" in subparagraph (A). would cover a subcontract like plaintiff's in which all payments to Cooper-Macdonald for 1969–1971 were necessarily contingent upon Colt's having received prime government contracts. On the same assumption, it is conceivable that subparagraph (C) would apply to plaintiff because another part of the same agreement with Colt's admittedly covered procurement services by Cooper-Macdonald (*see* footnote 6, *supra*). Defendant has made neither of these arguments in this proceeding and we leave them undecided.

### IV

Although plaintiff insists that it is not renegotiable at all for 1969–1971, it contends strongly that, to the extent it is held renegotiable, this should be under § 103(g)(2), 50 U.S.C. App. § 1213(g)(2),[19] with an annual floor of $1,000,000. We reject this argument. The Renegotiation Board Regulations (*see* 32 C.F.R. § 1499.1–5) confine § 103(g)(2), first, to arrangements made by "the owner of the patents" and, second, to "licenses and other similar arrangements involving royalty payments." We have ruled in Part I, *supra*, that the Fairchild-Colt's agreement involved a sale passing title to Colt's; accordingly, the arrangement between Colt's and Cooper-Macdonald could not be a "license" by plaintiff to Colt's, or a "*similar* arrangement" involving "*royalty* payments" by Colt's, the assignee of the patents (emphasis added).

Perhaps more important, plaintiff was in no sense the owner of the patents, in either the legal or the equitable sense. There is no claim of legal proprietorship and the

---

**16.** The latter part of the proposition is discussed in Part IV, *infra*.

**17.** Relating to a contract or arrangement under which—

"(A) any amount payable is contingent upon the procurement of a contract or contracts with a Department or of a subcontract or subcontracts;

\* \* \* \* \* \*

(C) any part of the services performed or to be performed consists of the soliciting, attempting to procure, or procuring a contract

or contracts with a Department or a subcontract or subcontracts."

**18.** Defendant's present position is that, as a matter of fact, Cooper-Macdonald played no significant role in Colt's obtaining its Government business.

**19.** "Subcontract" includes—

"(2) any contract or arrangement covering the right to use any patented or secret method, formula, or device for the performance of a contract or subcontract;"

only assertion of equitable ownership is that C–M was a joint venturer with Fairchild and Colt's in exploiting the patents. It is plain, however, that in a joint venture the members must share control of the property as well as participate in both the profits and the losses. *See Commissioner v. Tower*, 327 U.S. 280, 286–87, 66 S.Ct. 532, 90 L.Ed. 670 (1946); *Lentz v. United States*, 346 F.2d 570, 575, 171 Ct.Cl. 537, 546 (1965); *Venneri v. United States*, 340 F.2d 337, 343, 169 Ct.Cl. 74, 83 (1965). There is no reason to think that plaintiff met these components. Under the Colt's-Cooper-Macdonald agreement, Colt's could, at its sole discretion, limit or discontinue use of the Fairchild patents (by diminishing or ending its manufacture and sale of rifles) "without incurring any liability whatsoever to Cooper-Macdonald by reason thereof." Thus, plaintiff had no part in the control of the patents. Nor is there any showing that plaintiff would bear any part of losses suffered by Colt's through the patents. Cooper-Macdonald was a broker or finder, not a joint venturer.

Much more weakly, plaintiff wonders whether, if it has to be renegotiated, the proper "subcontract" definition would not be § 103(g)(1), 50 U.S.C. App. § 1213(g)(1) [20] —also subject to a floor of $1,000,000. Pointing out that (a) the Fairchild patent rights were required for the performance of Colt's federal rifle contracts and (2) "materials" in § 103(g)(1) includes "technical data, processes, and other personal property" (*see* § 103(k), plaintiff says that its services to Colt's conceivably could be viewed as under an agreement "to perform * * * any part of the work * * *" or, given the degree of control Cooper-Macdonald had over the patent rights, "to * * furnish any materials," required to perform Colt's renegotiable prime contracts.

This semi-suggestion will not wash. The fact is that plaintiff performed none of the Colt's work nor did it furnish the Fairchild patents. Colt's bought the patents from Fairchild under an agreement which we have held in Part I, *supra*, to be free of renegotiation. What Cooper-Macdonald did was, as a broker, to bring the other two together and to help Colt's in acquiring the patents and Fairchild in selling them to Colt's; this was something quite different from "furnishing" the patents.[21] The short of it is that the terms of § 103(g)(1) simply do not accommodate this case without the greatest of strain. It is very doubtful, too, that § 103(g)(1) includes patent rights, which are specifically covered by § 103(g)(2), *supra*. Since that provision is also inapplicable here, we are left with § 103(g)(3) if plaintiff's receipts from Colt's are to be renegotiated. See Part III, *supra*.

### Conclusion

For these reasons, we grant plaintiff's motion for summary judgment insofar as it pertains to the receipts from Fairchild and deny it insofar as it pertains to the receipts from Colt's. The case is returned to the Trial Division for further proceedings consistent with this opinion.

---

**20.** "Subcontract" includes—

"(1) any purchase order or agreement (including purchase orders or agreements antedating the related prime contract or higher tier subcontract) to perform all or any part of the work, or to make or furnish any materials, required for the performance of any other contract or subcontract, but such term does not include any purchase order or agreement to furnish office supplies."

**21.** Moreover, we have just rejected plaintiff's claim that it had control over the patents—the predicate for its argument that it could be said to have "furnished" them under § 103(g)(1).